**AMALGAMATED BANK OF NEW YORK, Plaintiff,**

v.

**Raymond J. MARSH and 86 University Rest. Corp. d/b/a Viva Pancho (a/k/a Maria Sanchez), Rosemary F. Marsh, Alexandra Marsh, Gerald Marsh, Cindy Marsh, Martiniano Chapa, Ludovina Chapa, Charles Mallia, Mary Mallia, and Laredo, Inc., Defendants.**

No. 89 Civ. 7896(RJW).

United States District Court,
S.D. New York.

June 4, 1993.

Peter Reiser, Hart & Hume, New York City, for plaintiff.

A. Carlos Cruz, A. Carlos Cruz & Associates, Huntington, NY, for defendants 86 University Rest. Corp. d/b/a Viva Pancho and Martiniano Chapa and Ludovina Chapa.

ROBERT J. WARD, District Judge.

Defendant 86 University Rest. Corp. d/b/a Viva Pancho ("Viva Pancho") moves for an order, alternatively: (1) dismissing plaintiff Amalgamated Bank of New York's ("the bank") second amended complaint (the "amended complaint"), pursuant to Rule 12(b)(6), Fed.R.Civ.P.; (2) granting judgment on the pleadings, pursuant to Rule 12(c), Fed.R.Civ.P.; or (3) granting summary judgment on the pleadings pursuant to Rule 56(c), Fed.R.Civ.P. Defendants Martiniano Chapa and Ludovina Chapa (collectively "the Chapas") move for an order dismissing the amended complaint for failure to state a claim against them upon which relief can be granted, pursuant to Rule 12(b)(6), Fed. R.Civ.P. For the following reasons, Viva Pancho's motion is granted and the Chapas' motion is denied.

## BACKGROUND

In the amended complaint, plaintiff alleges that defendant Raymond Marsh ("Marsh") masterminded a scheme through which he embezzled over $8,000,000 from the bank. Employed by the bank for over nine years, from July 21, 1980 through November 8, 1989, Marsh's responsibilities included supervision of the Clearance Loan Department and work in the Commercial Loan and Mortgage Department. At the time he left the bank, Marsh was assistant vice president. Together with Martiniano Chapa, Marsh also owned and controlled a New York corporation known as Viva Pancho which operated a restaurant at 86 University Place. Plaintiff claims that the remaining defendants all received, directly or indirectly, funds embezzled by Marsh from the bank.

In April 1991, Marsh pleaded guilty to embezzlement in violation of 18 U.S.C. § 656. He was sentenced to 37 months in prison, fined $1,000,000 and ordered to pay $1,500,-000 in restitution. Marsh is presently incarcerated.

*The Amended Complaint*

According to the amended complaint, Marsh devised a scheme whereby he used his position within the bank in order to divert funds to his personal account, Viva Pancho's account, and the accounts of other defendants. Creating false entries in the bank's books and altering other entries and bank

documents, Marsh caused the issuance of 350 official checks totalling more than $8,000,000. These official bank checks were made payable to a number of accounts at other banks. Attached to the amended complaint as Exhibit A, the bank submitted a list of all the issued checks and specifically indicated with an asterisk all the checks received by Viva Pancho.

The amended complaint contains five counts against Marsh and Viva Pancho. In Count I, plaintiff claims that Marsh and Viva Pancho conducted and participated, directly and indirectly, in the conduct of the affairs of certain enterprises through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). Specifically, Count I alleges that Marsh and Viva Pancho engaged in fraudulent conduct resulting in a "pattern of racketeering activity" which would be indictable under 18 U.S.C. §§ 1341 and 1343 and 18 U.S.C. §§ 1956 and 1957. In violation of §§ 1341 and 1343, Marsh and Viva Pancho are alleged to have repeatedly engaged in a scheme or artifice to defraud the bank through mail or wire fraud. With respect to §§ 1956 and 1957, Marsh and Viva Pancho are alleged to have engaged in money laundering in that they conducted financial transactions involving the proceeds of theft, embezzlement or misapplication by a bank employee.

Count II alleges that Marsh and Viva Pancho participated in a fraud. According to the amended complaint, both Marsh and Viva Pancho consistently and intentionally made material misrepresentations to the bank. The amended complaint claims that Marsh and Viva Pancho made these false representations in an effort to deceive the bank and prevent it from discovering and terminating the scheme. The bank reasonably relied on the representations and as a direct and proximate result of these intentional misrepresentations, it suffered $8,963,967.57 in damages.

In Count III, the amended complaint alleges that Marsh and Viva Pancho's wrongful appropriation of the bank's funds constituted conversion. Counts IV and V refer exclusively to Marsh. In the former, plaintiff alleges that Marsh, as an employee of the bank, owed a duty of loyalty not to misappropriate bank property intentionally for his own use and for the use of others, and that he breached the duty. In Count V, the amended complaint alleges that by failing to repay any of the wrongfully appropriated funds, Marsh should be held in breach of quasi contract.

Counts VI and VII are directed to the Chapas and the other defendants. The amended complaint alleges in Count VI that the transfer of funds to these defendants amounted to fraudulent conveyances as they were made without fair consideration and, at the time of the conveyances, Marsh intended or believed that he would incur debts beyond his ability to pay. In Count VII, the amended complaint alleges that under principles of equity, defendants should not be permitted to retain any moneys they had received.

*Viva Pancho's Motion*

As its first ground for seeking dismissal of the amended complaint, Viva Pancho contends that plaintiff does not plead allegations of fraud with particularity as is required by Rule 9(b), Fed.R.Civ.P. According to Viva Pancho, the amended complaint: fails to differentiate among the defendants; presents no facts as to how, when, or to what extent any particular defendant joined the alleged conspiracy; and, most importantly, neglects to specify the time, place, and contents of false representations and by whom or to whom such representations were made. In Viva Pancho's view, plaintiff's vague allegations regarding the existence of a conspiracy amount to an attempt to circumvent the requirements of Rule 9(b).

Viva Pancho also seeks dismissal of the amended complaint because, it maintains, plaintiff has not complied with the statutory requirements of RICO set out in 18 U.S.C. § 1962(c). In particular, Viva Pancho argues that the amended complaint fails to: (1) allege the existence of an "enterprise" within the meaning of 18 U.S.C. § 1961(4); (2) demonstrate that it was "associated with" plaintiff or any of its departments; (3) prove sufficiently that it participated in the conduct of any enterprise violating § 1962(c); and (4) plead allegations of mail fraud and wire fraud with particularity. Viva Pancho also argues that plaintiff's § 1962(c) claim is not within the legislative intent of the RICO statute,

and that once the federal RICO claim is dismissed, all pendent state law claims should be dismissed as well for lack of jurisdiction.

*The Chapas' Motion*

The bank alleges that the Chapas received embezzled money from Marsh with knowledge of the fraud and therefore the transfers were fraudulent conveyances. The Chapas argue that in raising state law causes of action against them, the bank relies on sections of New York's Debtor–Creditor Law, which are inappropriate since Marsh did not assume a debtor-creditor relationship with the bank. The Chapas further contend that they did not engage in fraudulent transfers with Marsh. According to the Chapas, all of the transfers were made for full consideration, the negotiations with Marsh were at arms length, and they had no knowledge of any fraud or embezzlement. Finally, the Chapas maintain that they are precluded from liability because any losses sustained by plaintiff were the result of the bank's failure to supervise its employees.

## DISCUSSION

A. *Standards for Dismissing a Complaint Under the Federal Rules of Civil Procedure*

Viva Pancho seeks dismissal of the claims against it in the alternative pursuant to Rules 12(b)(6), 12(c), or 56(c), Fed.R.Civ.P. The Chapas move for dismissal of the amended complaint exclusively under Rule 12(b)(6). A motion for failure to state a claim brought under Rule 12(b) is made only "before pleading if a further pleading is permitted." In contrast, a motion for judgment on the pleadings pursuant to Rule 12(c) is made "[a]fter the pleadings are closed." In both contexts, however, if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Rules 12(b) and (c), Fed.R.Civ.P.

Because the Chapas have submitted the affidavit of Martiniano Chapa in support of their motion, the Court converts their motion to dismiss into a motion for summary judgment.[1] Conversely, inasmuch as Viva Pancho has presented no affidavits or other matters outside of the pleadings along with its motion, the Court need not convert its motion to dismiss into a summary judgment motion.

Moreover, regardless of whether Viva Pancho's motion was made before or after the pleadings were closed, the standards for determining its outcome are the same.[2] According to Fed.R.Civ.P. 12(h)(2), the defense

1. Fed.R.Civ.P. 12(b) requires that when a court converts a motion to dismiss for failure to state a claim into a summary judgment motion, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." This Court has provided both parties reasonable opportunity to present all materials necessary for a summary judgment motion. Recognizing that the Court would convert the Chapas' motion to dismiss into a summary judgment motion, plaintiff included a Rule 3(g) statement and affidavit in opposition along with its opposition papers. In reply, although the Chapas had the opportunity to submit a Rule 3(g) statement and any subsequent affidavits, they chose instead to submit only an affirmation in further support of their motion to dismiss. Recently, the Second Circuit reiterated the standard for determining the adequacy of notice of conversion of a motion to dismiss into a motion for summary judgment. " 'The essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.' " *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 592 (2d Cir.1993) (quoting *In re G. & A. Books*, 770 F.2d 288 (2d Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986)). Clearly, once plaintiff submitted a 3(g) statement, the Chapas should have reasonably recognized the possibility that the motion would be converted into one for summary judgment and they had a reasonable opportunity to meet facts outside the pleadings.

2. The bank filed its original complaint on November 29, 1989 and Viva Pancho filed its answer on May 11, 1990. On May 24, 1991, the bank filed an amended complaint and Viva Pancho filed its answer to the amended complaint on June 11, 1991. In July 1992, the bank moved for leave to file a second amended complaint and Viva Pancho cross-moved to dismiss the first amended complaint. On October 27, 1992, this Court granted leave to the bank to file its second amended complaint and denied Viva Pancho's motion to dismiss without prejudice to renew. Viva Pancho's current motion is a renewed ver-

of failure to state a claim upon which relief may be granted, typically raised pursuant to Rule 12(b)(6), may be interposed after an answer has been filed by moving for judgment on the pleadings pursuant to Rule 12(c). Although Rule 12(h)(2) requires that in moving to dismiss for failure to state a claim after filing an answer, the movant invoke Rule 12(c) rather than Rule 12(b)(6), the Second Circuit instructs that "the same standards that are employed for dismissing a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) are applicable" on a motion to dismiss the complaint for failure to state a claim under Rule 12(c). *Ad-hoc Comm. of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College,* 835 F.2d 980, 982 (2d Cir.1987); 5A C. Wright & A. Miller, Federal Practice and Procedure § 1367, at 515 (1990). Accordingly, the Court will employ the standards for reviewing a Rule 12(b)(6) motion in determining Viva Pancho's Rule 12(c) motion and the standards for summary judgment under Rule 56(c) in reviewing the Chapas' motion.

1. Motion to Dismiss Under Rule 12(b)(6)

■ In considering a motion to dismiss for failure to state a claim upon which relief may be granted, a court is limited to the facts stated in the complaint. *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991). However, The complaint includes any written instrument attached to it as an exhibit and any statements or documents incorporated into it by reference. *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir. 1985).

■ The court is required to accept the facts alleged in the complaint as true, *Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992), read the complaint generously, and draw all reasonable inferences in favor of the plaintiff. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989) (citing *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir.1985)). The

complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). In short, "[t]he function of a motion to dismiss 'is merely to asses the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)).

2. Motion for Summary Judgment Under Rule 56(c)

Summary Judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ. P.; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If no rational fact finder could find in the nonmovant's favor, there is no genuine issue of material fact and summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). The Supreme Court has emphasized that a principal purpose behind the summary judgment rule is the disposal of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552. Accordingly, a party opposing a motion for summary judgment "must do more than simply show there is some metaphysical doubt as to the material facts ... In the language of [Federal Rule of Civil Procedure 56], the non-moving party must come forward with 'specific facts showing there is a *genuine issue for trial.*'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis in original).

sion of its earlier motion to dismiss and has thus been brought after its answer was filed.

In ruling on the motion, however, the court must resolve all ambiguities and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Binder v. Long Island Lighting Co,* 933 F.2d 187, 191 (2d Cir.1991). The movant has a heavy burden of showing that facts which would warrant summary judgment are undisputed because "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions not those of the judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513. In making a summary judgment determination, then, the court does not resolve disputed issues of fact, but assesses whether material factual issues remain for the trier of fact. *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990).

### B. *Viva Pancho's Motion*

1. Rule 9(b)—Pleading Fraud with Particularity

In assessing the legal feasibility of plaintiff's amended complaint with respect to defendant Viva Pancho, the Court must first determine whether the bank's fraud allegations have been pleaded with sufficient specificity. When alleging fraud, "the circumstances constituting fraud ... shall be stated with particularity," but "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b), Fed.R.Civ.P.

Rule 9(b)'s specificity requirement serves three purposes: (1) it provides a defendant with adequate notice of a plaintiff's claim in order to prepare a defense; (2) it protects defendant's reputation or goodwill from damage due to baseless allegations of fraud; (3) and it reduces the number of strike suits. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).

In order to satisfy Rule 9(b), "a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett,* 886 F.2d at 11. Where there are multiple defendants, the complaint must disclose the specific nature of each defendant's participation in the alleged fraud. *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d at 1247 ("[F]raud allegations ought to specify the time, place, speaker and content of the alleged misrepresentations.").

While Rule 9(b) allows "condition of mind" to be averred generally, plaintiff must at least present those circumstances that provide a minimal factual basis for allegations of scienter. *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987). In other words, plaintiff must " 'specifically plead those events' which 'give rise to a strong inference' that defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Id.* (citing *Ross v. A.H. Robins,* 607 F.2d 545, 558 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980)); *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) ("Although scienter need not be alleged with great specificity, plaintiffs are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent").

Viva Pancho's contention that plaintiff distinguishes the specific defendants only in the caption and initial paragraphs of the amended complaint and that it fails to differentiate the acts of fraud committed by Viva Pancho as opposed to Marsh is inaccurate. The amended complaint details how Marsh orchestrated the scheme by tampering with the bank's books and by issuing checks to his own account and to others accounts including Viva Pancho. Viva Pancho's participation is delineated in Exhibit A. Exhibit A is captioned "List of Defalcation Checks in Chronological Order." It is a chart consisting of the following nine columns: (1) Item Number; (2) Check Number; (3) Date; (4) Payee; (5) Amount; (6) Annual Total; (7) Cumulative Total; (8) Date of Deposit; and (9) Date of Statement Deposit Appeared. Penned in along the left side are asterisks indicating

which defalcation checks can be attributed to Viva Pancho as material misrepresentations.

Furthermore, in Count II, entitled "Fraud as to Defendants Marsh and Viva Pancho," the amended complaint neatly separates Marsh's material misrepresentations from those of Viva Pancho. With respect to Marsh, the amended complaint identifies two forms of material misrepresentations. First, he issued checks with the knowledge that none of the recipients were entitled to them. Second, he concealed the embezzlement scheme by listing false journal entries in the bank's books. Amended Complaint ¶¶ 33–34. As to Viva Pancho's acts of fraud, the amended complaint states:

> Viva Pancho consistently and intentionally made material misrepresentations to Amalgamated Bank by receiving, accepting and depositing the proceeds of numerous defalcation checks illustrated at Exhibit A hereto with knowledge that the checks were wrongfully procured, and intentionally concealed material information that these checks were wrongfully procured.

*Id.* ¶ 35. Because Marsh's misrepresentations are distinctly separated from those of Viva Pancho's, the amended complaint sufficiently distinguishes Viva Pancho's participation in the alleged fraud.

 Similarly, Viva Pancho is incorrect in claiming that plaintiff presents no facts as to how, when, and to what extent any particular defendant joined the alleged conspiracy. A RICO claim is deficient if "it fails to allege any facts demonstrating a knowing agreement involving each of the defendants to commit at least two predicate acts." *Metro Furniture Rental, Inc. v. Alessi,* 770 F.Supp. 198, 201 (S.D.N.Y.1991). "[T]he complaint must allege some factual basis for a finding of a conscious agreement among the defendants." *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n. 4 (2d Cir.1990). In short, a RICO claim, based on the predicate acts of mail fraud and wire fraud, must comply with Rule 9(b)'s pleading requirements. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 49–50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *Center Cadillac, Inc. v. Bank Leumi*

*Trust Co.,* 808 F.Supp. 213, 228 (S.D.N.Y. 1992).

 As stated above, to comply with Rule 9(b), a plaintiff must generally state the time, place, content, and speaker of the alleged misrepresentation. With respect to the predicate act of mail fraud, however, "the complaint need not specify the time, place and content of each mail communication where the nature and the mechanics of the underlying scheme is sufficiently detailed, and it is enough to plead the general content of the misrepresentation without stating the exact words used." *Center Cadillac, Inc. v. Bank Leumi Trust Co.,* 808 F.Supp. at 229. In asserting a violation of the federal mail fraud statute, plaintiff needs to show the existence of a scheme to defraud and a knowing use of the mails to execute the scheme. 18 U.S.C. § 1341. Moreover, proving mail fraud requires a showing of an intent to defraud, or reckless conduct rising to the level of intentional behavior. *O'Malley v. New York City Transit Authority,* 896 F.2d 704, 706–07 (2d Cir.1990); *United States v. Rodolitz,* 786 F.2d 77, 80 (2d Cir.), *cert. denied,* 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986). Therefore, when alleging mail fraud as a predicate act, Rule 9(b) requires the amended complaint to specify: (1) precisely what statements were made in what documents or oral representations; (2) the time and place of each such statement and the person responsible for making the same; (3) the content of the statements and the manner in which they misled the plaintiff; and (4) what the defendants obtained as a consequence of the fraud. *Equitable Life Assur. Soc. v. Alexander Grant & Co.,* 627 F.Supp. 1023, 1029 (S.D.N.Y.1985). These same requirements apply to wire fraud. *United States v. Ventura,* 724 F.2d 305, 310 (2d Cir.1983) (18 U.S.C. § 1343 parallels 18 U.S.C. § 1341).

The amended complaint clearly describes how, when and to what extent the scheme involved conscious participation on the part of all of the defendants including Viva Pancho. It asserts that Marsh began the scheme in 1981, that the scheme lasted for approximately eight years, and that, as a result of the scheme, funds were diverted

from the bank to Marsh's own accounts, Viva Pancho's account and the accounts of other defendants. Amended Complaint ¶ 17. In orchestrating the scheme, Marsh "ha[d] official checks of Amalgamated bank issued, made payable to his bank accounts at other banks and to the bank accounts of others, including Viva Pancho.... A list of these checks is attached as Exhibit A." *Id.* ¶ 18. The amended complaint then details how Marsh credited these checks on the bank's official ledger:

> Marsh would cause the corresponding debit to be made to a Clearance Loan department customer's demand deposit account, to a customer's loan account or to the Bank's internal account for its deposits at Chemical Bank. Marsh would subsequently correct these improper debit entries with corresponding credits, only to make more improper debit entries in these same or other accounts. Marsh would thereafter move these improper debits from account to account. A list of the false transactions that Marsh caused to be made from 1984 through 1989 is attached hereto as Exhibit B and is incorporated by reference herein.

*Id.* ¶ 19. As a result of Marsh's transactions, the amended complaint alleges that the bank incurred losses of $8,963,967.57. In identifying how the other defendants participated in the scheme, the amended complaint explains: "None of the persons or entities receiving these official checks ... was or is a customer of the Commercial Loan and Mortgage Department or the Clearance Loan Department. *There was no legitimate reason for any of these persons or entities to be receiving funds from the Commercial Loan and Mortgage Department or the Clearance Loan Department.*" *Id.* ¶ 18 (emphasis added). By accepting and depositing the bank's official checks, Viva Pancho made material representations to the bank that it was entitled to the checks.

The factual basis demonstrating Viva Pancho's conscious participation in the scheme is furnished by Exhibit A. It lists at least 67 separate checks that were allegedly obtained by Viva Pancho through acts of fraud from July 1, 1986 through October 30, 1989. For example, the first of the defalcation checks on Exhibit A attributed to Viva Pancho is item number 170. It corresponds to check number 0283576, its date of issuance and date of deposit were July 1, 1986, the payee was Chemical Bank account number 012–052981, and the amount was $9000.

Through Exhibit A, in fact, the amended complaint specifies the time, place and content of the false representations as well as by whom or to whom such representations were made. Whether "time" of the misrepresentation is determined by date of issuance or by date of deposit, both are provided for in Exhibit A. The "place" of the misrepresentation refers to the banks at which Viva Pancho had its accounts. Viva Pancho's accounts at Chemical Bank and Manufacturers Hanover Trust are represented in the payee column of Exhibit A by the abbreviations CHEM and MHT respectively. The "content" of Viva Pancho's misrepresentations was the acceptance and deposit and the retention of the proceeds of the official checks. Inasmuch as Exhibit A includes a date of deposit column, it is clear that Viva Pancho accepted, deposited and retained the proceeds. In addition, the amended complaint alleges that Viva Pancho knew it was not entitled to the proceeds and it thus concealed material information that the checks were wrongfully procured. By concealing its wrongful procurement of the checks, Viva Pancho can be considered the "speaker" of the material misrepresentations. Together with the factual information provided in Exhibit A, the amended complaint's allegation that "Viva Pancho consistently and intentionally made material misrepresentations to Amalgamated bank by receiving, accepting and depositing the proceeds of numerous defalcation checks" is plead with sufficient particularity. Therefore, Viva Pancho's motion to dismiss the amended complaint cannot be granted based on the special pleading requirements for fraud under Rule 9(b), Fed. R.Civ.P.

2. Statutory Requirements of RICO Under 18 U.S.C. § 1962(c)

However, Viva Pancho's motion to dismiss will be granted based on the

bank's failure to comply with the statutory requirements of 18 U.S.C. 1962(c). To state a claim for civil damages under RICO, a plaintiff must allege that a defendant violated the substantive RICO statute, 18 U.S.C. § 1962, and that this violation caused injury to the plaintiff in his business or property. *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 100 (2d Cir.1990) (citing 18 U.S.C. § 1964(c)).[3] When bringing a civil RICO claim pursuant to § 1962(c), a plaintiff must specifically prove:

> (1) the existence of an enterprise which affects interstate or foreign commerce;
>
> (2) that the defendant was "employed by" or "associated with" the enterprise;
>
> (3) that the defendant participated in the conduct of the enterprise's affairs; and
>
> (4) that the participation was through a pattern of racketeering activity.

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 913 F.2d 948, 950 (D.C.Cir.1990) (en banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991) (citing *Alcorn County Miss. v. U.S. Interstate Supplies, Inc.,* 731 F.2d 1160, 1168 (5th Cir.1984)). While the bank may be able to demonstrate elements (1), (2), and (4), it cannot prove element (3), that Viva Pancho participated in the conduct of the enterprise's affairs, and for that rea-

son the Court dismisses the amended complaint with respect to Viva Pancho.[4]

In a recent decision, *Reves v. Ernst & Young,* —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court determined the scope of Section 1962(c) by closely examining the statute's language. Relying on a dictionary definition of "conduct" as "mean[ing] to lead, run, manage, or direct," the court explicitly rejected the view that "almost any involvement in the affairs of an enterprise would satisfy the 'conduct or participate' requirement." *Id.* at ——, 113 S.Ct. at 1169 (citing Webster's Third New International Dictionary 474). Instead, *Reves* adopted an "operation or management" test and held that in order " 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' [pursuant to] § 1962(c), one must participate in the *operation or management* of the enterprise itself." *Id.* at ——, 113 S.Ct. at 1173 (emphasis added).

Prior to the *Reves* decision, this Court was guided by the Second Circuit's reading of "to conduct or participate" within the meaning of § 1962(c). Unlike some other circuits, the Second Circuit understood the conduct or participate clause more broadly than the current "operation or management" test.[5] The

---

**3.** Section 1962 lists four types of unlawful racketeering activities which may form the basis for a RICO claim. Under this section, it is unlawful for a person to:

> a) use income from a "pattern of racketeering activity" to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce.
>
> b) acquire or maintain any interest in such an enterprise through a pattern of racketeering activity.
>
> c) *conduct or participate in the conduct of such an enterprise through a pattern of racketeering activity.*
>
> d) conspire to violate subsections (a), (b), or (c).

18 U.S.C. § 1962(a)–(d) (emphasis added).

**4.** RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity ... or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The amended complaint alleges two enterprises in the scheme. The first comprises individuals employed by the two constituent departments at the bank for which Marsh worked,

the Commercial Loan and Mortgage Department and the Clearance Loan Department. Amended Complaint ¶ 24. The second alleged enterprise is the bank itself. *Id.* ¶ 25.

Viva Pancho argues that because the amended complaint neglects to specify how the individuals in these groups share a common purpose to engage in a particular course of conduct and how they joined together as a group, the bank has not properly alleged the element of enterprise. However, enterprise need only be proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). The amended complaint explicitly alleged that members of the constituent departments "functioned and continued to function, as a continuing unit." Amended Complaint ¶ 24. The bank itself is clearly an ongoing organization with a common purpose of engaging in a course of conduct as it is a "New York banking corporation." *Id.* ¶ 1.

**5.** The Court of Appeals for the District of Columbia Circuit, in particular, suggested that "to con-

220

Second Circuit held that one "participates in the conduct of the enterprise" or "conducts the activities of the enterprise" in either of two ways:

> when (1) one is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise, or (2) the predicate offenses are related to the activities of that enterprise.

*United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); *see also United States v. Robilotto,* 828 F.2d 940, 947–48 (2d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 662 (1988). Now, however, one is not liable under § 1962(c) unless one has participated in the operation or management of the enterprise itself.

▆▆▆ Nevertheless, the bank still maintains that Viva Pancho is liable under § 1962(c) for two reasons. First, according to the bank, Viva Pancho participated in the operation or management of the bank by "permitting the deposit into its own account of 67 separate Official Checks issued by Amalgamated Bank ... and by retaining said moneys thereby representing that Viva Pancho was entitled to said Official Checks and the proceeds thereof." Letter from Peter Reiser (May 28, 1993). Second, the bank alternatively argues that Viva Pancho is liable under § 1962(c) "by jointly participating in and aiding and abetting the RICO scheme with defendant Marsh who, unquestionably, participated in the operation and management of the RICO enterprise...." *Id.* However, inasmuch as neither of these bases "indicates some degree of direction" as is now required by the Supreme Court, the Court finds that Viva Pancho did not conduct or participate in the operation or management of the bank's affairs. *Reves v. Ernst & Young,* —— U.S. at ——, 113 S.Ct. at 1169.

By way of illustration, a recent Southern District case clearly elucidates why Viva Pancho's relationship with the enterprise does not sufficiently constitute conduct or participation in the enterprise under the "operation or management" test. In *United States v. Altman,* 820 F.Supp. 794 (S.D.N.Y.1993), Judge Whitman Knapp dismissed an indictment count because the defendant did not participate in the operation or management of the enterprise itself. The defendant, who held a position of trust at the Surrogates' Court of New York County, was charged with having looted an estate, over which he was executor, a conservatorship for a mentally impaired man, and a receivership of an antique company. Judge Knapp held that while the defendant may have betrayed the trust that the enterprise, the Surrogates' Court, had imposed upon him, "there is no suggestion that he ever 'directed' anyone else to do anything." *Id.* at 795.

Similarly, while Viva Pancho's retaining the proceeds of bank checks signifies an association with the bank, it does not indicate that Viva Pancho actually directed anyone, as is required by the "operation or management" test. *Reves* acknowledges that § 1962(c) specifically prohibits anyone "employed by or associated with any enterprise" from conducting or participating in racketeering activity. However, the "employed by or associated with" clause does not extend liability under § 1962(c) to complete outsiders. Outsiders are liable under § 1962(c) only "if they are 'associated with' an enterprise and participate in the conduct of its affairs—that is, participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young,* —— U.S. at ——, 113 S.Ct. at 1173. Thus, *Reves* envisions liability under § 1962(c) beyond upper management because "[a]n enterprise is 'operat-

duct or participate, directly or indirectly, in the conduct of such enterprise's affairs" requires *"significant* control over or within an enterprise." *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union, 639,* 913 F.2d 948, 954 (D.C.Cir.1990) (en banc) (emphasis added), *cert. denied,* —— U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). While the Supreme Court in *Reves* adopted the "operation or management" test, it did not interpret this test as strictly as the

District of Columbia Circuit because, "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some part* in directing the enterprise's affairs is required." *Reves v. Ernst & Young,* —— U.S. at ——, 113 S.Ct. at 1170 (emphasis added).

ed' not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management." *Id.* In particular, *Reves* refers to an enterprise " 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id.* In *Altman,* Judge Knapp reasoned that based on the indictment and the bill of particulars, the defendant could not be viewed as having exercised control over the enterprise. In the instant case as well, the amended complaint does not suggest that Viva Pancho exerted control over either enterprise—the bank or its constituent departments—and thus cannot be held to have conducted or participated in the conduct of the enterprise's affairs in violation of § 1962(c). Therefore, consistent with the Supreme Court's reading of § 1962(c) in *Reves,* this Court grants Viva Pancho's motion to dismiss plaintiff's federal RICO claim against it for failure to state a claim.

### 3. Pendent Jurisdiction

 Under the doctrine of pendent jurisdiction, "a federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.' " *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988) (quoting *United Mine Workers v. Gibbs* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). While *Gibbs* expanded the power of federal pendent jurisdiction, it also emphasized the doctrine's discretionary character and indicated that the "power need not be exercised in every case in which it is found to exist." *United Mine Workers v. Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139. "Under *Gibbs,* a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. at 350, 108 S.Ct. at 619. If, after weighing these factors, it is clear that the case belongs in state court then the federal court should refrain from exercising jurisdiction and dismiss the case without prejudice.

Viva Pancho urges this Court to dismiss the bank's state-law claims against it inasmuch as dismissal of the RICO claim precludes the exercise of pendent jurisdiction. In fact, *Gibbs* itself instructs: "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139. While this assertion does not institute a mandatory and inflexible rule, it does "recognizes that in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine ... will point to declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7.

In this action, additional discovery must be conducted before the case will be ready for trial. Thus, in the interests of comity and judicial economy, the Court declines to retain jurisdiction over the remaining state law claims and dismisses plaintiff's state-law claims against Viva Pancho without prejudice.

### C. *The Chapas' Motion*

 In Count VI of the amended complaint, the bank claims that as part of the embezzlement scheme, Marsh caused the issuance of official checks to defendants including the Chapas. Amended Complaint ¶ 53. Relying on the New York Debtor and Creditor Law, plaintiff alleges that these transfers of funds were fraudulent conveyances as against the bank, because at the time the conveyances were made, Marsh: (1) "was insolvent or was rendered insolvent ... and the defendants did not give fair consideration," *Id.* ¶ 56 (citing N.Y.Debt. & Cred.Law § 273 (McKinney 1990)); (2) "intended or believed that he would incur debts (*i.e.,* his obligation to reimburse Amalgamated Bank) beyond his ability to pay," *Id.* ¶ 57 (citing

N.Y.Debt. & Cred.Law § 275 (McKinney 1990)); and (3) "acted with actual intent to defraud Amalgamated Bank." *Id.* ¶ 58 (citing N.Y.Debt. & Cred.Law § 276 (McKinney 1990)).[6] In their motion to dismiss, which has been converted to a summary judgment motion, the Chapas first contend that reliance on debtor-creditor law is misplaced since this is not a bankruptcy case and Marsh did not borrow the money from the bank, he stole it. Thus, before assessing whether material factual issues remain for the trier of fact regarding the fraudulent conveyance claim, the Court must first determine whether Marsh assumed a debtor-creditor relationship with the bank.

### 1. The Debtor–Creditor Relationship

New York has codified the Uniform Fraudulent Conveyance Act ("UFCA") in Article 10 of its Debtor and Creditor Law, §§ 270–281. *See, Southern Industries, Inc. v. Jeremias,* 66 A.D.2d 178, 411 N.Y.S.2d 945, 948 (1978). In interpreting the provisions of this act, the statute instructs "[t]his article shall be so interpreted and construed as to effectuate its general purpose to make uniform the laws of those states which enact it." N.Y.Debt. & Cred.Law § 281 (McKinney 1990). As a remedial statute, Article 10's provisions should be accorded liberal construction. *St. Johnland Nursing Home, Inc. v. Perlman,* 134 Misc.2d 1048, 514 N.Y.S.2d 171, 173 (Co.Ct.1987).

Article 10 explicitly defines "creditor" as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." N.Y.Debt. & Cred.Law § 270 (McKinney 1990). Commenting on the broad scope of this definition, Judge Cardozo wrote: "The act in its definition of a creditor seeks a rule of uniformity and in so doing levels distinctions that at times have been the refuge of the dilatory debtor." *American Surety Co. v. Conner,* 251 N.Y. 1, 7, 166 N.E. 783 (1929). In addition, the statute defines "debt" as "includ[ing] any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." *Id.* Therefore, based both on a liberal reading of Article 10's provisions and on section 270's broad definition of creditor and debt, the Court must draw all reasonable inferences in favor of the bank and deny the Chapas' motion for summary judgment with respect to the applicability of the New York Debtor and Creditor Law.[7]

### 2. "Fair Consideration" and "Good Faith" under the Fraudulent Conveyance Statute

The Court now examines whether summary judgment should be granted in favor of the Chapas regarding alleged fraudulent transfers Marsh made to them. To establish a claim for fraudulent conveyance, a plaintiff must demonstrate "either that the transfer was made without fair consideration, or that it was made with actual intent to hinder, delay or defraud creditors or that defendants were insolvent or were rendered insolvent

---

**6.** Modern fraudulent conveyance law has ancient antecedents. It is derived primarily from the statute of 13 Elizabeth, which was passed by parliament in 1571, and

> was aimed at a practice by which overburdened debtors placed their assets in friendly hands thereby frustrating creditors' attempts to satisfy their claims against the debtor. After the creditors had abandoned the effort to recover on their claims, the debtor would obtain a reconveyance of the property that had been transferred. Such transactions operated as a fraud against the debtor's creditors because the debtor's estate was depleted without exchanging property of similar value from which the creditors' claims could be satisfied.

*Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 644–45 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1476, 117

L.Ed.2d 620 (1992). Modern fraudulent conveyance laws generally makes it "fraudulent" for a debtor to transfer its assets to a third party with intent, actual or constructive, to impede creditors from proceeding against the assets.

**7.** Even if New York's Debtor and Creditor Law would not apply, the Court still must consider the common law claims for "money had and received" alleged by the bank against the Chapas in the amended complaint. This is an action based upon breach of contract implied in law and "is an obligation which the law creates in the absence of an agreement when one party possesses money that in equity and good conscience he ought not to retain and that belongs to another." *Parsa v. State,* 64 N.Y.2d 143, 485 N.Y.S.2d 27, 29, 474 N.E.2d 235, 237 (1984). The Chapas have not challenged this claim in their motion.

thereby." *International Association of Machinists and Aerospace Workers v. Allegis Corp.*, 144 Misc.2d 983, 545 N.Y.S.2d 638, 642 (Sup.Ct.1989); *see also, Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1272 (S.D.N.Y.1991).

The Chapas maintain that the conveyances were made with fair consideration. The UFCA defines "fair consideration" as:

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation, is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

N.Y.Debt. & Cred.Law ¶ 272 (McKinney 1990). Martiniano Chapa asserts that he acted in good faith because he "had no knowledge that defendant Marsh was embezzling from plaintiff ... the first time I was made aware of Marsh embezzling money was when he was arrested by the F.B.I." Chapa Aff. ¶ 6.

However, the term "good faith" is not synonymous with the absence of fraudulent intent. *Southern Industries, Inc. v. Jeremias*, 411 N.Y.S.2d at 949. All that "[t]he lack of good faith imports" is "a failure to deal honestly, fairly and openly." *Id.* Indeed, a lack of good faith can be established in various ways. First, if there has not been "an honest belief in the propriety of the activities in question." Second, if there is "intent to take unconscionable advantage of others." Third, if there is "intent to, or knowledge of the fact that the activities in question will hinder delay, or defraud others." *Id.*

Martiniano Chapa argues that he received money from Marsh only as compensation for services rendered as a consultant and manager at Marsh's restaurants. Chapa Aff. ¶ 5. However, the bank counters with evidence showing that the Chapas were direct recipients of moneys stolen by Marsh. In particular, the bank highlights the suspicious nature of thirteen official checks totalling $278,937.50 which Marsh caused to be issued to bank accounts controlled by the Chapas. Reiser Aff. ¶¶ 2, 5.[8] Plaintiff reasons that compensating a restaurant manager with an official bank check is highly unusual. Moreover, plaintiff claims that compensating a manager in amounts ranging from $5,340 to $140,000 is equally suspect. Finally, the bank underscores the Chapas' irregular payment schedule as is evident by the dates listed on the checks. The Chapas received two official bank checks on March 18, 1986, one for $9,900 and the other for $8,500. Three days later, on March 21, 1986, the Chapas received two checks each for $9,700 and then three days after that they received checks for $5,430 and $6,320. In sum, the Chapas received six official bank checks totalling approximately $50,000 in the space of six days. Therefore, the Court finds that the Chapas' knowledge of Marsh's theft presents a genuine issue of disputed fact and cannot at this time determine whether at the time of the conveyances they were acting honestly, openly and fairly.[9]

Finally, the Chapas maintain that because the bank's losses should be attributed to its own failure to supervise an employee, they should be precluded from liability. Insofar as the bank's alleged negligence is a genuine issue of material fact still in dispute, the Court denies summary judgment on this ground as well.

---

8. According to the bank, as part of his embezzlement scheme, Marsh caused the bank to issue official checks to accounts owned or controlled by the Chapas at Manufacturers Hanover Trust and at Chemical Bank. With the Reiser affidavit, the bank has submitted the Chapas' bank statements for these accounts which show that the checks were deposited. Reiser Aff. ¶¶ 4–7, Exs. 1, 2.

9. The Chapas were only added as defendants to this action relatively recently, on October 26, 1992. As a result, the bank has yet to engage in discovery with respect to claims against the Chapas and cannot detail the extent to which the Chapas had knowledge of Marsh's embezzlement scheme. Nevertheless, the suspicious nature of the checks warrants denying summary judgment on the issues of good faith and full consideration.

## CONCLUSION

For the foregoing reasons, defendant Viva Pancho's motion pursuant to Rule 12(c), Fed. R.Civ.P., to dismiss plaintiff's federal RICO claim against it for failure to state a claim, is granted. In addition, plaintiff's pendent state-law claims against Viva Pancho are dismissed without prejudice. Defendants Martiniano and Ludovina Chapa's motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim, which has been treated by the Court as a motion for summary judgment pursuant to Rule 56(c), Fed. R.Civ.P., is denied.

The remaining parties are directed to complete discovery by September 3, 1993 and file a joint pre-trial order by October 1, 1993.

It is so ordered.