**GENERAL MOTORS CORPORATION
and Adam Opel AG, Plaintiffs,**

v.

**Jose IGNACIO LOPEZ DE ARRIORTUA,
et al., Defendants.**

No. 96–71038.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 26, 1996.

Eugene Driker, Detroit, MI, for plaintiffs.

James P. Denvir, Larry S. Gondelman, Anthony T. Pierce, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Washington, DC, Howard J. Trienens, David T. Pritikin, Thomas D. Rein, Sidley & Austin, Chicago, IL, William A. Sankbeil, Kerr, Russell & Weber, P.L.C., Detroit, MI, for defendants.

## OPINION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS COUNTS ONE AND TWO OF THE COMPLAINT

EDMUNDS, District Judge.

This matter came before the court at a hearing on October 28, 1996, on the following motions: Defendants' joint motion to dismiss counts 1 and 2; VW, Piech, and Neumann's motion to dismiss counts 1 and 2; and VWOA and Lytle's motion to dismiss counts

1 and 2. For the reasons set forth below, Defendants' motions to dismiss are denied.

## I. Facts [1]

Plaintiffs, General Motors Corporation ("GM") and Adam Opel AG ("Opel"), brought suit against Defendants alleging theft of trade secrets and conspiracy. GM is an American corporation and Opel is a German corporation wholly owned by GM. Defendants include:

1. Volkswagen AG, a German corporation ("VW")

2. Volkswagen of America, Inc., wholly owned by Volkswagen AG ("VWOA")

3. The "Lopez Group," including the following individuals who worked at GM or its subsidiaries until March of 1993 when they left and joined VW:

   Jose Ignacio Lopez, a former executive at GM Espana, Opel, and GM (Europe) AG. On February 1, 1993 he became group vice president of GM. Subsequently, on March 10, 1993, he resigned from GM and moved to Germany. On March 16, he joined VW and was appointed to its management board.

   Jose Manuel Gutierrez, executive director of purchasing with GM Espana (based in Spain). He quit on March 22, 1993. He moved to Germany and joined VW as a division head.

   Jorge Alvarez, a platform manager for the S–Car and the O–Car for Opel when he quit on March 22, 1993. He then joined VW's subsidiary SEAT, in Spain, as a purchasing director.

   Rosario Piazza, a sourcing specialist for Opel when he quit on March 22, 1993. He then joined VW in Spain as head of forward sourcing.

   Hugo Van der Auwera, executive director of worldwide purchasing, metallic commodity group, for GM Continental (based in Belgium) when he quit on March 22, 1993. He joined VW as a division head.

Francisco Garcia–Sanz, executive director of worldwide purchasing, electrical commodity group, for GM when he quit on March 22, 1993. He joined VW as a division head.

Andries Versteeg, manager-European liaison, advance purchasing and global sourcing, for GM when he quit on March 22, 1993. He joined VW as a division head.

Willem Admiraal, an employee of GM when he quit on March 22, 1993. He then joined VW. He is married to Lopez's daughter, Irene.[2]

4. The "VW Group" including:

   Ferdinand Piech, the chairman of the board of VW;

   Jens Neumann, a member of VW's management board and member of the VWOA board;

   Jaero Wicker, a VW employee in Wolfsburg and later, when Lopez was hired by VW, an administrative assistant to Lopez; and

   H.W. Lytle, executive director of human resources for VWOA.

Plaintiffs allege that at least as early as August 1992 until March 1993, while Lopez was a high level GM executive, Lopez secretly communicated with VW representatives and agreed to leave GM and join VW. He agreed to bring confidential business plans and trade secret information with him. Lopez worked with the other Lopez Group Defendants to secretly collect confidential documents, transparencies, and computer diskettes including: listings of GM and Opel components by worldwide supplier, price, terms, conditions, and delivery schedules (including a copy of GM's Product Purchasing System (PPS) and GM Europe's European Purchasing Optimization System (EPOS)); plans for "Plant X," the factory of the future; future auto plans to the year 2003; and future strategies for purchasing.

In March of 1993, the Lopez Group Defendants all left GM and Opel to join VW where

---

**1.** The facts set forth here are the same as those set forth in this court's order denying Defendants' motions to dismiss for lack of personal jurisdiction.

**2.** Defendants allege that Alvarez, Piazza, Garcia–Sanz, Versteeg, and Admiraal all had employment contracts with Opel in Germany, not with GM in the U.S.

they were paid significantly higher salaries. They allegedly took over 20 cartons of stolen documents with them. Plaintiffs allege that the Lopez Group immediately copied the documents and entered them into VW computers, a process which took almost a month. To cover up the theft, the Defendants then shredded the documents with a shredder borrowed from VW's plant in Kassel.

In June of 1993, German police discovered four boxes of trade secret documents in the home of Lopez's associates. German police also found GM and Opel documents at Lopez's home and at VW. Complaint para. 202–211. For example, German police seized documents coded "Plant B" from various VW locations. These documents were identical to Opel's confidential Plant X material, except that the Opel logo was removed and the VW logo was inserted. Complaint para. 195.

On July 9, 1993, Alvarez sent a letter to Gutierrez suggesting that they come up with an explanation for having the documents. Paragraph 198 of the complaint quotes the letter (translated from Spanish) as follows:

> Dr. V. Hulsen [VW's general counsel] is of the opinion that we should have an explanation for this matter. ... Of the documents found, there are some that I would have no reason to possess, which could get us into trouble.... [I]f we take the offensive by saying that some documents weren't in the box, and it winds up that the prosecutor's office plans to say that the documents found aren't secret ... it would wind up that someone would have had to put the nonsecret documents in the boxes, something pretty strange. On the other hand, if it winds up that the business about the prosecutor's office saying that there weren't any secrets is all a hoax and they charge us, we should already have stated that some of the documents had been placed in my house by Opel. If we say it only after the prosector's office charges us, it will be a little late.

The complaint alleges that Defendants falsely stated that they did not possess any documents. Lopez told reporters at a news conference on June 14, 1993, that the Lopez Group did not take anything. Complaint para 196. On July 17, 1993, Piech also denied that the Lopez Group had taken anything. Complaint para. 195 & 197. On or around July 28, 1993, Piech publicly claimed that the documents the German police found in Alvarez's home had been planted by Opel. Complaint para. 199.

On August 13, 1993, VW hired KPMG Peat Marwick, the German branch of the accounting firm, to conduct an investigation of the activities of the Lopez Group. In October of 1993, KPMG delivered a report to VW. VW requested that the report be abridged, and the abridged version was released on November 26, 1993. VW claimed that the report exonerated VW. Plaintiffs claim that the report, both in its complete and abridged forms, confirms Plaintiffs' allegations of wrongdoing. The report states that GM documents were brought to VW, copied, and shredded. Complaint para. 214–219.

These circumstances resulted in both a criminal case and a civil case against the Defendants in Braunschweig, Germany. The German civil case was initiated by VW and the Lopez Group to enjoin GM, Opel, and GM Espana from interfering with VW's employment of GM's former employees. GM, Opel, and GM Espana counterclaimed,[3] based on the actions which are the basis of the complaint here. The counterclaim seeks information regarding the documents taken and seeks the return of the documents. It also requests injunctive and declaratory relief relating to the employment by VW of the Lopez Group. The counterclaim also requests a declaratory judgment that VW and the Lopez Group are liable for any damage that arises from VW's employment of the Lopez Group and use of GM and Opel trade secrets. That is, the counterclaim seeks a declaratory judgment of liability, not damages.[4] The German civil case is currently

---

**3.** Defendants characterize this as a permissive counterclaim. Buxbaum second supplemental affidavit.

**4.** GM and Opel asked that the German court permit them to later request damages when the

amount can be specified. Defendants' Exhibit 6, Buxbaum Aff.

stayed, at the request of GM, pending the investigation of the German criminal action.

On March 7, 1996, Plaintiffs filed this U.S. civil suit. Their complaint alleges the following counts (against all Defendants unless otherwise specified):

1. Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) & 1964(c), based on the predicate violations of wire fraud, 18 U.S.C. § 1343; interstate and foreign travel to aid racketeering, 18 U.S.C. § 1952; tampering with witnesses, 18 U.S.C. § 1512; transportation and receipt of stolen goods, 18 U.S.C. §§ 2314 & 2315

2. Conspiracy to Violate RICO, 18 U.S.C. §§ 1962(d) & 1964(c)

3. Lanham Act, 15 U.S.C. § 1126

4. Copyright Act, 17 U.S.C. § 101 et seq.

5. Fraud, against the Lopez Group Defendants

6. Breach of Fiduciary duty, against Lopez Group Defendants (excluding Lopez)

7. Conversion

8. Misappropriation of Trade Secrets

9. Conspiracy

10. Unjust Enrichment, against VW and VWOA.

Defendants' actions allegedly caused Plaintiffs enormous damage. GM and VW are the two largest car sellers in the Western European market. VW allegedly has used and continues to use the trade secret information to reduce its costs substantially and to increase its market share.

Defendants moved to dismiss count 1 (RICO) and count 2 (RICO conspiracy). For the reasons set forth below, Defendants' motions are denied.

## II. Standard for a Motion to Dismiss

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) this court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *In re DeLorean Motor Company,* 991 F.2d 1236, 1240 (6th Cir.1993). The complaint must include "direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Id.* (citations omitted).

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. *Davis H. Elliot Co., Inc. v. Caribbean Utilities Co.,* 513 F.2d 1176, 1182 (6th Cir.1975). In a light most favorable to plaintiff, assuming all allegations are true, the court must determine whether the complaint states a valid claim for relief. A motion to dismiss a complaint for failure to state a claim should not be granted "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (citations omitted). However, a court need not accept as true legal conclusions or unwarranted factual inferences. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987).

## III. Analysis

Count one of the complaint alleges that Defendants violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) & 1964(c) (treble damages)[5], based on the predicate violations of wire fraud, 18 U.S.C. § 1343; interstate and foreign travel to aid racketeering, 18 U.S.C. § 1952; tampering with witnesses, 18 U.S.C. § 1512; and transportation and receipt of stolen goods, 18 U.S.C. §§ 2314 & 2315. Count two alleges conspiracy to violate RICO, 18 U.S.C. §§ 1962(d)[6] & 1964(c).

RICO provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which

---

**5.** Section 1964(c) provides:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....

**6.** Section 1962(d) provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). "Racketeering activity" means any act or threat involving specified state crimes, specified federal statutes, and specified federal crimes. 18 U.S.C. § 1961(1). Defendants move to dismiss the RICO claims on various grounds.

## A. Continuity Element

All named Defendants (except Alvarez, Piazza, and Versteeg who have not been served) move to dismiss the RICO claim because Plaintiffs have not pled that Defendants conducted a "pattern" of racketeering activity. More specifically, Defendants claim that the allegations do not meet RICO's continuity requirement.

In *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court set forth some guidelines to use in determining whether the continuity requirement has been met. The Court advocated a "common sense approach to RICO's pattern element," *id.* at 237, 109 S.Ct. at 2899, and explained that pattern means a relationship between the predicate acts together with the threat of continuing activity. *Id.* at 239, 109 S.Ct. at 2900. While the limits of "relationship" and "continuity" must be determined on a case by case basis, *id.* at 242 & 243, 109 S.Ct. at 2902 & 2903, the court did set forth certain parameters.

The Court found the element of relationship easier to define. The relationship between the predicate acts can be shown by "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or in other words are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)).

The element of continuity is more difficult to define. The Court explained:

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement.

*Id.* at 241–42, 105 S.Ct. at 2902 (citation omitted). For example, continuity can be established by showing that the criminal predicates are part of a legitimate business's regular way of doing business. *Id.* at 243, 105 S.Ct. at 2902.

Courts look to the totality of the circumstances to determine whether a pattern of racketeering exists. *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir.), *cert. denied*, 502 U.S. 985, 112 S.Ct. 595, 116 L.Ed.2d 619 (1991). The Sixth Circuit has adopted a multifactor test to determine whether a RICO pattern exists:

1. the length of time the racketeering activity existed;

2. the number of different schemes (the more the better);

3. the number of predicate acts within each scheme (the more the better);

4. the variety of species of predicate acts (the more the better);

5. the distinct types of injury (the more the better);

6. the number of victims (the more the better); and

7. the number of perpetrators (the less the better).

*Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101 (6th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1041, 134 L.Ed.2d 189 (1996).

The Supreme Court in *H.J., Inc.* also cautioned against defining pattern as a multiple scheme as opposed to a single scheme, because whether a multiple or a single scheme exists is "in the eye of the beholder." *Id.* at 241 n. 3, 109 S.Ct. at 2901 n. 3.

[W]hether a [single or multiple] scheme exists depends on the level of generality at which criminal activity is viewed. For example, petitioners' allegations that Northwestern Bell attempted to subvert public utility commissioners who would be voting on the company's rates might be described as a single scheme to obtain a favorable rate, or as multiple schemes to obtain favorable votes from individual commissioners on the ratemaking decision. Similarly, though interference with ratemaking spanning several ratemaking decisions might be thought of as a single scheme with advantageous rates as its objective, each ratemaking decision might equally plausibly be regarded as distinct and the object of its own "scheme." There is no obviously "correct" level of generality for courts to use in describing the criminal activity alleged in RICO litigation.

*Id.*

Courts have not adopted a bright line test of what period of time constitutes a minimum duration for a closed-ended scheme. Under some circumstances, schemes lasting as long as eighteen months have been found insufficient to support a RICO claim. *See, e.g., Vemco, Inc. v. Camardella,* 23 F.3d 129 (6th Cir.1994) (holding racketeering activity over seventeen month period did not satisfy continuity requirement under RICO because complaint alleged single criminal episode where defendant committed crimes to get one plaintiff to pay for one paint system), *cert. denied,* ——— U.S. ———, 115 S.Ct. 579, 130 L.Ed.2d 495 (1994); *Gotham Print, Inc. v. American Speedy Printing Centers, Inc.,* 863 F.Supp. 447 (E.D.Mich.1994) (holding isolated acts of mail and wire fraud over 18 month period did not satisfy pattern element of RICO). Under other circumstances, shorter schemes have been found sufficient to support a RICO allegation. *See, e.g., Gould, Inc. v. Mitsui Mining & Smelting Co. Ltd.,* 750 F.Supp. 838 (N.D.Ohio 1990) (where plaintiff brought RICO claim against two companies that allegedly received stolen trade secrets from plaintiff's former employ-

ee, court held thirteen months of predicate acts were sufficient to establish continuity).

Defendants claim that the complaint alleges a single scheme which cannot constitute a RICO pattern because it lasted for only four months. Defendants claim that the first alleged predicate act occurred on December 1, 1992, when Lopez allegedly first stole documents. Tr. at 8. Defendants further claim that the scheme ended on April 10, 1993, when VW received the last of the documents. Tr. at 8.

■ Because the existence of a single scheme is "in the eye of the beholder",[7] the court must look to the parameters set forth in *H.J., Inc.* and the multifactor test set forth in *Columbia* to determine if the complaint sufficiently alleges a RICO pattern. The court finds that the allegations meet both the standards for a closed-ended scheme and for an open-ended scheme.

The complaint alleges that the scheme began as early as August of 1992 when VW first contacted Lopez to induce him to steal Plaintiffs' trade secrets and bring them to VW. Complaint para. 54. Plaintiffs contend that the phone call to Lopez constituted the predicate act of wire fraud. Tr. at 34–35; Complaint para. 231. The scheme did not terminate when VW received the documents, but allegedly continued while Defendants made use of the documents and engaged in various coverup activities.

■ A RICO scheme is extended by each related predicate act that the defendant committed. For example, in *United States v. Maloney,* 71 F.3d 645 (7th Cir.1995), *cert. denied,* ——— U.S. ———, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996), a county judge was charged with accepting bribes to "fix" cases. The charges included criminal RICO; the defendants' actions in obstructing justice through witness tampering were considered part of the RICO pattern. These actions were taken to cover up the bribery and to enable the judge to keep his position on the bench. *Accord United States v. Cannistraro,* 800 F.Supp. 30, 76 (D.N.J.1992) (holding

---

**7.** The Defendants claim that the Plaintiffs allege a single scheme to steal trade secrets from a single victim. However, it could just as easily be said that the Plaintiffs allege multiple thefts of multiple trade secrets.

obstruction of justice predicates were part of continuing pattern to conceal mail and securities fraud).

Defendants argue that coverup activities after the underlying scheme was completed do not constitute continuation of the scheme. They argue that this is different than a coverup in furtherance of a continuing conspiracy, as in *Maloney*. *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (cited in *Maloney,* 71 F.3d at 659–60). However, the complaint alleges that the coverup activities did not occur after the scheme was completed but occurred as part of a continuing RICO conspiracy. The complaint alleges that Defendants schemed to steal, copy, and use the trade secrets. The documents were copied and shredded in April of 1993. The Defendants made allegedly false statements regarding whether they had taken documents in July of 1993. In late November of 1993, VW released an abridged version of the KPMG Peat Marwick report allegedly exonerating VW. Witness tampering under 18 U.S.C. § 1512 includes misleading conduct with intent to cause a person to withhold testimony or a document as well as alteration of documents. Thus, the complaint states a claim that Defendants committed predicate acts spanning a period of at least sixteen months, from August of 1992 when VW first contacted Lopez (alleged wire fraud), through March of 1993 when Defendants stole the trade secrets (alleged transportation and receipt of stolen goods and travel to aid racketeering), through November of 1993 when the abridged KPMG report was released (alleged witness tampering).

In addition to the time span of the alleged scheme, an application of the *Columbia* factors demonstrates that this complaint meets the continuity requirement. Although the complaint only alleges two victims, GM and Opel, the complaint alleges multiple schemes and multiple predicate acts. Defendants schemed to steal boxes of trade secrets, to transport the documents to Europe, to copy them into VW's computers, to destroy the evidence, and to engage in a coverup thereby enabling VW to utilize the stolen trade secrets. Plaintiffs asserted at oral argument that the complaint alleges approximately 150

predicate acts. Tr. at 36. Further, the complaint alleges five different types of predicate acts: violations of wire fraud, 18 U.S.C. § 1343; interstate and foreign travel to aid racketeering, 18 U.S.C. § 1952; tampering with witnesses, 18 U.S.C. § 1512; transportation and receipt of stolen goods, 18 U.S.C. §§ 2314 & 2315. In addition, plaintiffs allege many distinct types of injury: lost profits, decreased market share, unjust enrichment, and conversion. The number of perpetrators is small. Plaintiffs allege that Lopez led the Lopez Group of seven men and Piech led the VW Group of three men.

The complaint also sufficiently alleges an open-ended RICO scheme under *Gould, Inc. v. Mitsui Mining & Smelting Co.,* 750 F.Supp. 838 (N.D.Ohio 1990), because the Defendants threaten to commit predicate acts through their utilization of the stolen trade secrets. In *Gould,* a plaintiff brought a RICO claim against two companies that received stolen trade secrets from a former employee of plaintiff. In finding that plaintiff sufficiently alleged a RICO claim, the court noted that there were threats of continued activity because the defendants would be continuing to use plaintiff's trade secrets.

Defendants claim that each successive use of a trade secret does not constitute a new predicate act of theft and thus subsequent use does not serve to continue a RICO scheme, relying on *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.,* 883 F.2d 48 (7th Cir.1989). In that case, the plaintiff contended that the defendant schemed to steal plaintiff's proprietary software. The plaintiff claimed that each time the defendant used the software constituted another predicate act. The court disagreed, finding that the theft occurred only when the defendant first copied the software.

[Defendant's] subsequent use of the allegedly stolen software cannot be characterized as subsequent thefts. When a thief steals $100, the law does not hold him to a new theft each time he spends one of those dollars. The same is true of the [software]. . . . Its subsequent and varied uses of the stolen software would not constitute

new offenses but would go only to the issue of damages.

883 F.2d at 51.

The *Management Computer Services* is not persuasive as applied to the facts of this case. "When the Supreme Court spoke of the threat of repetition, it was referring to the threat of repeated *victimization* . . . , not merely the retention of the ill-gotten fruits of previous crimes." *Gotham Print, Inc. v. American Speedy Printing Centers, Inc.*, 863 F.Supp. 447, 460 (E.D.Mich.1994). The thief who steals $100 and then spends it a dollar at a time has victimized the owner only once, at the time the theft occurs. But the thief who steals a trade secret victimizes the owner every time the trade secret is used because the owner suffers a new loss with each use of the secret. *See, e.g., Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516, 523 (7th Cir.1995) ("repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering"), *cert. denied,* —— U.S. ——, 116 S.Ct. 916, 133 L.Ed.2d 846 (1996); *American Automotive Accessories, Inc. v. Fishman*, 1996 WL 480369 (N.D.Ill. Aug. 22, 1996) (plaintiffs alleged that defendants obtained checks by repeated mail and wire fraud; plaintiffs alleged repeated economic injury by a single scheme because they alleged that each time new check was cashed, plaintiffs were damaged). Moreover, although the predicate acts constituting the original theft of trade secrets do not threaten to be repeated, a fair and warranted inference to be drawn from the complaint is that the predicate acts of wire fraud, witness tampering, travel to aid racketeering, and transportation of stolen goods threaten to be repeated as the Defendants make use of the stolen trade secrets.

It should be emphasized that the standard of review under Rule 12(b)(6) requires the court to assume everything in the complaint is true and to view the complaint in the light most favorable to the Plaintiffs. Under this standard, the complaint alleges a series of predicate acts that, if proven, would amount to a pattern of racketeering. This is not to say that Defendants are liable under RICO. Discovery may not support the allegations, or alternatively, Plaintiffs may not be able to convince a jury that Defendants committed the predicate acts and that these acts constituted a pattern of racketeering activity. *See Columbia,* 58 F.3d at 1111.

**B.  Enterprise**

■  Under RICO, a plaintiff must plead the existence of an enterprise. An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "To satisfy the enterprise requirement, an association-in-fact must be an ongoing organization, its members must function as a continuing unit, and it must be separate from the pattern of racketeering activity in which it engages." *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir.1993). The definition of enterprise also incorporates the continuity element. *In re Burzynski*, 989 F.2d 733, 743 n. 2 (5th Cir.1993).

■  Defendants argue that the complaint fails to allege a continuing enterprise. The same arguments regarding continuity that apply to the pattern of racketeering issue discussed above apply here as well. As explained above, the court finds that the allegations withstand a motion to dismiss because the complaint alleges an association-in-fact consisting of VW, VWOA, the VW Group, and the Lopez Group, whose activities continued at least sixteen months (a closed-ended scheme) or whose activities continue through this day (an open-ended scheme).

■  In addition to continuity, an enterprise must have a structure and goals separate from the predicate acts. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir.1995). Defendants also argue that Plaintiffs have failed to allege that the enterprise possessed any structure, had any decision-making authority, or that individuals within the enterprise had any assigned roles. Defendants interpret the allegations as those of a rag tag group, who worked for different companies, some of whom never met or spoke, working for the single goal of stealing documents.

■ Courts disagree whether specific facts regarding the requirement of an ongoing enterprise, organized with established roles, must be pleaded. *Compare Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989) (specific facts must be pleaded) *with Standard Chlorine v. Sinibaldi,* 821 F.Supp. 232, 241 (D.Del.1992) (notice pleading regarding existence of RICO enterprise sufficient). Even assuming the "enterprise" element must be pleaded with specificity, Plaintiffs have met this requirement.

■ VW and VWOA themselves participated in the theft and in the coverup by providing facilities for copying and shredding. Complaint para. 10, 47, 175–199, 203, 214–19. The participation of a corporation in a racketeering scheme may be sufficient, of itself, to give the enterprise a structure separate from the racketeering activity. *Webster v. Omnitrition Int'l, Inc.,* 79 F.3d 776, 786 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 174, 136 L.Ed.2d 115 (1996).

Moreover, the roles of the participants are specifically spelled out. Lopez controlled the Lopez Group, who followed him as their leader. Complaint para. 24, 32. The individuals in the group had special tasks based on their area of expertise. Complaint para. 25. Neumann was the alleged "key point man between the VW Group and the Lopez Group." Complaint para. 20. Piech was the coleader of the scheme. Complaint para. 5–6, 26, 50–53. The goals of the enterprise were to steal and use Plaintiffs' trade secrets, to personally enrich the individuals, and to enable VW to cut costs and compete more favorably.

### C. Conspiracy

Defendants seek dismissal of the RICO conspiracy claim under count 2 of the complaint for the same reasons that they seek dismissal of count 1. That is, because Plaintiffs have failed to state a claim under RICO, they also have not stated a claim that Defendants agreed to violate RICO. *See, e.g., Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 495 (6th Cir.1990). As stated above, because the complaint sufficiently alleges

RICO, it also sufficiently alleges that Defendants agreed to violate RICO.

### D. Direct Injury

■ Defendants also contend that the RICO allegations should be dismissed because Plaintiffs have not alleged a direct injury. Under RICO, a plaintiff must allege that he has been injured directly by the defendant's predicate acts. *Firestone v. Galbreath,* 976 F.2d 279, 285 (6th Cir.1992).[8] For example, in *District Telecommunications Dev. Corp. v. District Cablevision, Inc.,* 638 F.Supp. 418, 418–19 (D.D.C.1985), the plaintiff alleged that the defendant's acts of wire and mail fraud caused the plaintiff to not be awarded a cable franchise and thus to lose the earnings it would have had. The court held that this did not constitute a direct injury as required under RICO.

■ Here, Defendants claim that Plaintiffs only allege indirect injuries of lost market share and lost profits. Plaintiffs allege that the theft of trade secrets permitted VW to reduce its costs, thus causing VW to increase its market share and profits, thus causing Plaintiffs to lose their market share and lower their profits. Also, Defendants claim that GM was only injured indirectly. The complaint alleges injury to Opel's market share in Europe, not to GM's market share. *Warren v. Manufacturers Nat'l Bank,* 759 F.2d 542 (6th Cir.1985) (derivative injury insufficient under § 1964(c); creditor, shareholder, and chairman of company could not sue derivatively).

Defendants' argument that injury to Plaintiffs is remote is strained, at best. Defendants ignore the plain allegations of the complaint, the allegations that Defendants stole trade secrets from Plaintiffs. Each theft of each trade secret constitutes an injury for which Plaintiffs may recover. In *General Environmental Science Corp. v. Horsfall,* 800 F.Supp. 1497, 1503 (N.D.Ohio 1992), *aff'd in part, vacated in part on different grounds,* 25 F.3d 1048 (Table) (6th Cir.1994) (text available on WESTLAW), the court addressed a RICO claim based on theft of trade secrets. There, the court explained that

---

**8.** Note that RICO does not require a distinct "racketeering injury." *Sedima v. Imrex Co., Inc.,*

473 U.S. 479, 495, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985).

damages for theft of trade secrets can be measured by the victim's loss or by the wrongdoer's profits. *Id.* Further, lost profits are recoverable under RICO. It should also be noted that while certain damages may be speculative, this is a proof issue, not a pleading issue.

### E. Extraterritorial Conduct and Effects

■ Defendants also allege that the RICO claims should be dismissed because the complaint alleges only conduct and effects that occurred outside the United States. Legislation is meant to apply only within the territorial jurisdiction of the United States. *Equal Employment Opportunity Commission v. Arabian American Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991). Thus, federal statutes apply if the underlying conduct occurred within the United States or if conduct which occurred abroad has substantial effects within the U.S. *Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 261–62 (2d Cir.1989). Mere preparatory activities within the U.S. will not meet the territorial requirement. *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1046 (2d Cir.1983).

■ Defendants argue that only actions preparatory to the theft of the trade secrets occurred within the United States and that the alleged effect of Defendants' action is injury to Opel's market position in Europe. Defendants overlook allegations that Defendants stole trade secrets while they were lived and worked in the United States. Because many of the predicate acts were committed here, this court has jurisdiction over Plaintiffs' RICO claim.

### F. Operation or Management

Defendants VW, Piech, Neumann, VWOA, and Lytle move to dismiss the RICO claim against them, arguing that they did not operate or manage the alleged RICO enterprise. RICO provides, "It shall be unlawful for any person ... *to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs* through a pattern of racketeering activity ..." 18 U.S.C. § 1962(c) (emphasis added). The Supreme Court held in *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), that to be subject to liability under RICO, one must participate in the operation or management of the enterprise. RICO liability is not limited to those with primary responsibility or to those with a formal position in the enterprise. *Id.* at 178, 113 S.Ct. at 1170. An enterprise is operated both by upper management and by lower-rung participants, so long as they had some part in directing the enterprise's affairs. *Id.* at 184, 113 S.Ct. at 1173. Applying these principles, the Court in *Reves* held that accountants who prepared audit reports for a RICO enterprise did not participate in the operation.

*Reves* is essentially a case about the liability of outsiders who assist in a RICO scheme. *United States v. Oreto,* 37 F.3d 739, 750 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995). Insiders are more likely to be liable under RICO. "A person who is included in the complaint's definition of an enterprise is more likely to be found to exert some control over the enterprise." *Resolution Trust Corp. v. S & K Chevrolet Co.,* 918 F.Supp. 1235, 1247 (C.D.Ill.), *vacated in part on other grounds,* 923 F.Supp. 135 (C.D.Ill.1996). "Special care is required in translating *Reves'* concern with "horizontal" connections—focusing on the liability of an outside adviser—into the "vertical" question of how far RICO liability may extend within the enterprise but down the organization ladder." *Oreto,* 37 F.3d at 750. The *Reves* court expressly declined to decide the "vertical" liability issue. 507 U.S. at 184 n. 9, 113 S.Ct. at 1173 n. 9.

■ Defendants VW, Piech, Neumann, VWOA, and Lytle argue that the complaint does not allege that they participated in the operation or management of the RICO scheme. Allegations that they received stolen trade secrets are insufficient to establish participation in the RICO enterprise. Knowing receipt of fraudulently obtained funds, for instance, does not constitute participation in operation or management of a RICO scheme. *Morin v. Trupin,* 823 F.Supp. 201, 208 (S.D.N.Y.1993); *Amalgamated Bank v. Marsh,* 823 F.Supp. 209, 220 (S.D.N.Y.1993). *See also Resolution Trust,* 918 F.Supp. at 1246–47 (knowledge that fraud is being com-

mitted does not constitute participation in enterprise). Similarly, allegations that they input information into VW computers does not constitute participation. *See University of Maryland v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993) (computerization of accounting services and financial services as part of audit of enterprise did not constitute operation or management).

Merely conducting the affairs of VW does not constitute participation in the alleged RICO enterprise. Piech and Neumann assert that they merely recruited the Lopez Group as part of the management of VW. Defendants rely on *DeWit v. Firstar Corp.,* 879 F.Supp. 947, 958–59 (N.D.Iowa 1995) where the plaintiff alleged that the defendant banks managed a RICO enterprise by managing the banking activities of the enterprise. The complaint alleged that the banks knew that the business was fraudulent and still continued to provide banking services. Further, the banks took steps to minimize their losses at the expense of plaintiffs. The court dismissed the RICO claim, holding that the banks merely conducted their own affairs. They did not actually participate in the RICO enterprise. *See Resolution Trust,* 918 F.Supp. at 1248 (encouragement of individuals who perpetrated RICO scheme did not constitute participation in scheme).

In making these arguments, VW, Piech, Neumann, VWOA, and Lytle overlook the allegations of the complaint. The complaint specifically alleges that they were insiders who directly participated in the control and management of the RICO scheme. The complaint alleges that Piech and Neumann planned and participated in the management of the scheme. For example, the complaint states:

> Piech and others in the VW Group decided to target Lopez and induce him to come to VW, bringing with him the employees and trade secrets of plaintiffs needed to enable VW to quickly reduce its costs.

In furtherance of this scheme, beginning in August 1992 and perhaps earlier, the VW Group initiated a series of contacts with Lopez to explore his willingness to defect to VW.

Complaint para. 50–51. Paragraph 61 alleges, "Piech and Lopez also discussed Lopez bringing with him to VW the other members of the Lopez Group, because of their access to plaintiffs' trade secrets. Piech assured Lopez they would also be brought on board at excessive salaries." When the thefts were discovered, Piech allegedly participated in the coverup. Complaint para. 179, 182, 189, 197–99.

The complaint specifically names Neumann as a participant in negotiating Lopez's employment by VW. See, e.g., complaint para. 107. Neumann also arranged for the stolen documents to be transported to VW. "[O]n March 16, 1993, Neumann ordered a VW corporate jet to Barcelona in order to pick up the confidential documents that the Lopez Group had been secreting in Spain in anticipation of their defection to VW." Complaint para. 156.

VW provided money, transportation, copying, and shredding facilities. See, e.g., complaint para. 47 (lucrative salaries), 156 (VW jet transported documents), 162 (computer input and copying of trade secrets at VW facility) 170 (VW equipment used for shredding).[9] Because the complaint alleges that these Defendants both agreed to violate RICO and actually violated RICO, these allegations also state a claim for RICO conspiracy.

Lytle and VWOA claim that they did not knowingly participate in the operation of the RICO scheme and thus that they are not liable under RICO. Lytle and VWOA claim that the complaint only alleges that Lytle directed another VWOA employee to make a phone call and that this is not sufficient to establish participation in the management of a RICO scheme. They rely on *Schrag v.*

---

**9.** In addition to direct liability, VW can be vicariously liable for the actions of its agents, Piech and Neumann, in violation of section 1962(c). *Davis v. Mutual Life Ins. Co.,* 6 F.3d 367, 379 (6th Cir.1993) (where corporate defendant and RICO enterprise are distinguishable, vicarious liability is appropriate where the corporation benefitted from the scheme), *cert. denied,* 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994). Similarly, VWOA may be vicariously liable for the actions of Lytle.

*Dinges,* 150 F.R.D. 664 (D.Kan.1993) (summary judgment granted in favor of defendant who merely prepared routine paperwork without knowledge of wrongdoing), *aff'd,* 73 F.3d 374 (10th Cir.1995) (Table).

Lytle and VWOA's interpretation of the complaint is unduly narrow. Under Federal Rule of Civil Procedure 9(b), intent and knowledge may be pleaded generally. Further, in reviewing a complaint upon a motion to dismiss, the complaint must be viewed as a whole, and a court may make warranted factual inferences. *See Morgan,* 829 F.2d at 12. Moreover, even at the proof stage, allegations can be proved by circumstantial evidence. *United States v. Viola,* 35 F.3d 37, 44 (2d Cir.1994) ("[p]articipation in a [RICO] conspiracy can be shown wholly through circumstantial evidence ..."), *cert. denied,* —— U.S. ——, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995).

The complaint withstands Defendants' motion to dismiss because it sufficiently alleges that VWOA and Lytle knowingly participated in the conduct of the RICO scheme. Complaint para. 228–31. The complaint alleges:

> On March 22, [1993] Devra Barrett, an employee of Volkswagen of America, acting at the direction of H.W. Lytle, Executive Director of Human Resources for Volkswagen of America, telephoned and sent a facsimile from Detroit to Lopez's new assistant, Wicker, in Wolfsburg. Barrett asked where she should send the large carton of documents that Gutierrez had instructed her to send to Lopez in Germany. Wicker gave her the address in Wolfsburg and she arranged for the shipment. The carton, a foot and a half high and

deep, weighed 65 pounds and contained a large number of confidential GM documents.[10]

Complaint para. 157. On March 23, VWOA shipped the carton to Wicker. Wicker told Gutierrez that the box had arrived, and Gutierrez retrieved it. Complaint para. 158.

The complaint also alleges that Gutierrez assisted Lopez in the scheme to steal trade secrets. In February of 1993, Gutierrez gathered GM confidential documents, including among other things the Buyers' Support Book, unit price data, tool and die costs of certain car models, benchmarking documents, and global sourcing documents. Complaint para 31–32, 112–114, 118–120, 122–24. The complaint implies that Gutierrez delivered documents containing trade secrets to Lytle at VWOA at the time that Gutierrez was a GM employee. On March 22, Barrett asked where she should send the large carton of documents "that Gutierrez had instructed her to send to Lopez in Germany." Complaint, para. 157. Up until March 22, Gutierrez was employed by GM. Complaint para. 33. Thus, the complaint implies that Lytle accepted a large box of GM trade secret documents from a then GM employee. This constitutes the predicate act of knowing receipt of stolen trade secrets.[11]

Further, the complaint alleges that Lytle directed the shipment of the documents to Lopez at VW in Germany. This constitutes the predicate act of knowingly shipping stolen trade secrets across state lines. The RICO allegations specifically allege that Lytle and VWOA willfully and knowingly participated in the conduct of the RICO enterprise. Complaint para. 228–31. In sum, these alle-

---

10. VWOA and Lytle argue that because this paragraph refers to "confidential" documents, not "trade secrets," that it must not mean trade secrets. The court must construe the complaint in the light most favorable to the Plaintiffs, accept all factual allegations as true, and determine whether the Plaintiffs undoubtedly can prove no set of facts in support of their claims that would entitle them to relief. *In re DeLorean,* 991 F.2d at 1240. Under this standard, the allegation that the documents were "confidential" is sufficient for pleading purposes.

11. At oral argument, counsel for Lytle argued that Lytle's receipt of the documents did not

constitute the predicate act of receipt of stolen goods because the documents had not crossed state lines. However, at this stage of the proceedings, the court must construe the complaint in a light most favorable to Plaintiffs. The complaint alleges that Gutierrez obtained many trade secret documents from Europe. *See, e.g.,* Complaint para. 114, 118–120, 122–124. The complaint also alleges that Gutierrez delivered documents to Lytle. Complaint para. 157. In sum, it may be fairly inferred from the complaint that documents were collected from Europe, were transported to Gutierrez, and then were delivered to Lytle. Thus, the complaint alleges the predicate act of receipt of stolen goods.

gations are sufficient to state a claim that Lytle and VWOA are liable for participating in the operation of a RICO scheme. Because the complaint alleges that Lytle and VWOA both agreed to violate RICO and actually violated RICO, these allegations also state a claim for RICO conspiracy.

### G. Aiding and Abetting under RICO

Plaintiffs also claim that even if the complaint fails to allege that Defendants VW, Piech, Neumann, Lytle, and VWOA operated or managed a RICO scheme or conspired to violate RICO, the complaint alleges that they aided and abetted a RICO scheme. Defendants contend that while courts used to recognize aiding and abetting liability under RICO, such liability no longer exists in light of the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).[12] Because the court finds that the allegations of the complaint are sufficient to state a claim for RICO and RICO conspiracy, it is not necessary to reach the issue of aiding and abetting at this juncture.

### IV. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons explained above the court hereby orders as follows:

Defendants' joint motion to dismiss counts 1 and 2 is DENIED;

VW, Piech, and Neumann's motion to dismiss counts 1 and 2 is DENIED; and

VWOA and Lytle's motion to dismiss counts 1 and 2 is DENIED.

---

**12.** In *Central Bank,* the Court held that there was no aiding and abetting liability under section 10b of the Securities and Exchange Act because Congress did not expressly impose such liability. The phrase "directly or indirectly" as used in the statute did not suffice to impose aiding and abetting liability. Since *Central Bank,* lower courts have considered whether the *Central Bank* ruling means that there is not aider and abettor liability under RICO, because, like the Securities and Exchange Act, RICO does not expressly provide for such liability. Courts are in disagreement on whether one can be liable for aiding and abetting under section 1962(c). *Compare American Automotive Accessories, Inc. v. Fishman,* 1996 Westlaw 480369 *7 (N.D.Ill. Aug. 22, 1996) (because § 1962(c) prohibits "indirect participation" in a RICO scheme, it permits aider and abettor liability); *Schuylkill Skyport Inn, Inc. v. Rich,* 1996 Westlaw 502280 (E.D.Penn. Aug. 21, 1996) (same) *with Dept. of Economic Development v. Arthur Andersen & Co.,* 924 F.Supp. 449 (S.D.N.Y.1996) (§ 1962(c) RICO does not provide for liability for aiding and abetting). *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 270 (3d Cir.1995) (affirmed prior holding recognizing aider and abettor liability under RICO but did not consider whether *Central Bank* decision called these decisions into question). *See also Reves,* 507 U.S. at 178, 113 S.Ct. at 1170 (Court commented that the word "participate" as used in § 1962(c) has a narrower meaning that to "aid and abet").