**CONGREGACION de la MISION PROVINCIA de VENEZUELA, Paules Padres Community, Inc., Provincia de Zaragoza and Paules Padres Community Philippine Islands, Plaintiffs,**

v.

**Marcelo CURI, Rosa Curi, Jorge L. Curi, Thomas Janata, Lilliam Janata, Luis Perez Vega, Maria Luisa Perez Vega, Sheldon Feinstein and Eleanor Feinstein, Defendants.**

No. 96 CV 1914.

United States District Court, E.D. New York.

Sept. 5, 1997.

redress of grievances." U.S. CONST. amend. I.

Giaimo & Vreeburg, P.C., Kew Gardens, NY(Joseph O. Giaimo, of counsel), for Congregacion de la Mision Provincia de Venezuela, Paules Padres Community, Inc., Provincia de Zaragoza, Paules Padres Community Philippine Islands.

Eric G. Slepian, Bayside, NY, for Feinstein defendants.

Joseph W. Ryan, Jr., Uniondale, NY, for Curi defendants.

## AMENDED MEMORANDUM AND ORDER

NICKERSON, District Judge:

The three plaintiffs, Congregacion de la Mision Provincia de Venezuela (Venezuela); Paules Padres Community, Inc. Provincia de Zaragoza (Zaragoza); and Paules Padres Community Philippine Islands (Philippine Islands) brought this action against defendants alleging violations of the Racketeer Influence and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and state law. Plaintiffs seek compensatory and punitive damages.

The complaint, filed in this court in April 1996, says that between 1976 and 1994, defendants, together with Emilio Valdes (Valdes) and his wife Miriam Valdes (Miriam), engaged in a scheme to defraud plaintiffs of money they had entrusted to defendant Marcelo Curi (Curi) and Valdes for investment purposes, and that in furtherance of such scheme, each defendant committed or conspired to commit at least two or more acts of mail fraud, 18 U.S.C. § 1341; wire fraud, 18 U.S.C. § 1343; transporting goods stolen or taken by fraud, 18 U.S.C. § 2314; or securities fraud, 15 U.S.C. § 78j.

The scheme was allegedly brought to plaintiffs' attention by Valdes who, because of his cooperation with plaintiffs, is not a named defendant in this action.

Defendants move to dismiss, and Sheldon and Eleanor Feinstein move in the alternative for summary judgment.

## I.

The complaint, a prolix 66–page document, alleges the following relevant facts.

Plaintiffs are religious corporations whose members are Catholic priests devoted to preaching the "Gospel to the poor and promoting the health and mental welfare of their constituencies." Each of the plaintiffs is a member province of the Congregacion de la Mision, a Catholic religious community made up of forty-nine provinces throughout the world.

The nine defendants may be identified as follows. Curi is an attorney and real estate investor. Rosa Curi (Rosa) is Curi's wife; Jorge Curi (Jorge) is Curi's son; Lilliam Janata (Janata) is Curi's daughter and Thomas Janata (Thomas) is Curi's son-in-law. Luis Perez Vega and his wife Maria Luisa Perez Vega are friends of Curi. Sheldon Feinstein (Feinstein), also an attorney, was for some time Curi's law partner and later his real estate partner. Eleanor Feinstein (Eleanor) is Feinstein's wife.

In 1976 Valdes introduced Father Santos Perez Manzanado, a Venezuela priest, to Frank Fierro, a Merrill Lynch broker, and to Curi, who offered to invest Venezuela's funds in mortgages and real estate. Valdes told Fr. Manzanado that if he invested Venezuela's funds with Merrill Lynch and Curi, Valdes would supervise the investments.

In reliance on these representations, in September 1976, Venezuela gave $75,000 to Curi to make real estate investments on its behalf, and gave $100,000 to Merrill Lynch to open an investment account. Venezuela gave Valdes, who joined Merrill Lynch in 1980, signatory power over these investments and gave Miriam signatory power over its bank account. Philippine Islands opened an investment account with Merrill Lynch in 1984; Zaragoza did so in 1986. Both these plaintiffs gave Valdes full signatory power. Plaintiffs' accounts were later transferred to Oppenheimer & Co., Inc., and then to First Montauk Security Corporation. Plaintiffs collectively transferred $3,555,636 to these investment accounts.

### A. The scheme to defraud

Between 1976 and 1994, Valdes and Curi, together with the other defendants, used plaintiffs' money "to make secret real estate and loan transactions," the proceeds of which defendants used to purchase real estate, automobiles and securities for themselves, and to fund their own Individual Retirement Accounts. Defendants either stole plaintiffs' money directly, or embezzled it through fraudulent loan transactions and real estate ventures.

#### 1. Direct theft of plaintiffs' funds

On over twenty-five occasions, defendants received funds from plaintiffs that should have been used for investment purposes but instead were "converted" for defendants' own uses.

The complaint appears to allege, in this order, that defendants stole the following: $20,000 Curi represented was put into a certificate of deposit (1976); $4,000 in two installments Curi said was connected to the "Ruderman" loan (1981); $15,000 in a check Miriam mailed to Curi and which Curi endorsed "Jackson Heights property, B. Fleishman mortgage" (1985); $5,000 in a check Miriam mailed to Curi and which Curi endorsed "Garco Pharmaceutical" (1981);

$6,000 in a check Miriam mailed to Curi, deposited in Curi's escrow account and endorsed by Valdes "Ozone Park" (1984); $105,075 in fifteen checks deposited in Curi's escrow account between 1979 and 1987; $4,000 for an unauthorized automobile loan (1979); $35,000 in a check payable to Rosa (1979); $13,368 in ten checks payable to Curi and endorsed by Valdes with the words "aborted transaction" (1981–82); $5,400 in two checks payable to Curi for unauthorized "reimbursements" (1981); $8,202 in seven checks deposited in Jorge Curi's Merrill Lynch account (1981–1987); $20,000 deposited in Curi's Merrill Lynch account (1988); $2,000 cash deposited in Curi's Merrill Lynch account (1981); $1,375 check payable to Curi for fees (1984); $12,000 purportedly for a refund due to the Olympic Corporation (1981); $119,000 in three checks deposited into Curi's escrow account (1984–1986); $31,006 in nine checks payable to Jorge Curi (1982–1989); $1,000 deposited in Curi's Merrill Lynch Keogh Plan (date not given); and $100,000 in a check payable to Curi (1983).

### 2. *Loan transactions*

Curi represented to Valdes that he invested amounts of plaintiffs' money in at least twelve separate loan transactions. Many of these loans were never made. Plaintiffs only received partial payments in satisfaction of these "loans" and in many instances never recovered substantial portions of the principal.

The loan transactions are as follows: (1) $10,000 to Guillermo Diaz (1976), (2) $3,000 to Arnoldo Martinez (1976), (3) $13,000 to Constantino Cadavid (1978), (4) $7,000 to Menta Puig (1978), (5) $14,000 to Maria Mejia (1979), (6) $6,000 to G. Ruderman (1979), (7) $18,000 to Peca (1982), (8) $20,000 to Rudolf Obregon (1984), (9) $200,000 to Edward Maguire, Jr. (1983), (10) $122,500 to an "unnamed person" supposedly Janata (1983), (11) $105,000 to Vega (1982), and (12) $80,000 to Vega (1983).

### 3. *Real estate ventures*

Defendants also invested plaintiffs' money in a variety of real estate ventures, but failed to pay plaintiffs their return, and in some cases the principal, on the investments.

#### a. Marsego Realty Corporation

Around March 1978 Valdes and Miriam, using Venezuela's funds, became owners of 100 percent of the company stock of the Marsego Realty Corporation. That corporation owned a commercial building at 54–20 Roosevelt Avenue, Woodside, New York. Valdes and Miriam used Venezuela's funds to make mortgage payments and to maintain the property. In July 1984 Curi and Valdes sold the property for more than $90,000, making a $28,000 profit. Curi and Valdes converted this money for their own use.

#### b. 72–11 110th Street conversion project

Feinstein and Curi, as well as other individuals, entered into a partnership agreement to convert to cooperative ownership the building located at 72–11 110th Street in Forest Hills, New York. In connection with this agreement, on January 20, 1984 Valdes sent Curi a check for $50,000 payable to Curi "as attorney." Curi endorsed this check to Feinstein who deposited the check in his escrow account. Valdes also sent two checks directly to Feinstein, one for $80,000 and one for $5,000, both payable to Feinstein. Feinstein also deposited these checks in his escrow account.

In return for these payments, Feinstein issued cooperative shares in the building to Curi and Valdes. In 1987 Feinstein and the five other partners purchased Curi's and Valdes' shares for $135,000. Curi and Valdes then failed to return this money to plaintiffs.

#### c. 1632 Decatur Street

Sometime after the 110th Street transaction, Feinstein and Curi, using plaintiffs' money, purchased a building at 1632 Decatur Street in Ridgewood, New York. In 1988 the building was sold to Cornell Muskan who paid more than $100,000 and gave a purchase money mortgage to Rosa Curi and Eleanor Feinstein for $100,000. Rosa and Eleanor subsequently foreclosed upon the mortgage but failed to account to plaintiffs for the funds invested.

#### d. Other real estate transactions

Curi also used plaintiffs' funds to acquire property in: Colorado (date not given), Miami Beach, Florida (date not given), Garden City, New York (1983), and Ridgewood, New Jersey (1988). These properties were bought in the names of Valdes, Curi, Rosa, Janata and Thomas. Curi and Valdes concealed from plaintiffs the ownership of these properties.

### B. The 1982–84 transaction

In 1982 Venezuela transferred $350,000 to its Merrill Lynch investment accounts in reliance on Valdes' representation that the investment would grow to $550,000 by January 1984, the time when Venezuela would be required to pay for a plot of land it had purchased from Zaragoza.

In December 1983 or January 1984 Valdes and Curi told Zaragoza that they would transfer $550,000 from Venezuela's account in payment for the land. But in February 1984, Fr. Gregorio Olangua, Zaragoza's financial administrator, and Fr. Benigno Presa, Venezuela's financial administrator in New York, learned that payment would not be made in cash, as previously represented, but by the assignment of mortgages which Curi and Valdes represented were worth $413,000. Curi and Valdes also told the administrators that they would transfer $137,000 in cash from Venezuela's investment account to a Merrill Lynch account Valdes would open for Zaragoza.

Curi and Valdes made such representations despite the fact that such mortgages either did not exist or were worthless. Curi and Valdes failed to open a Merrill Lynch account in Zaragoza's name until 1986, two years after the meeting.

### C. Plaintiffs' discovery of the fraud

In 1991 Valdes left Merrill Lynch and joined Oppenheimer & Co., Inc., at which time plaintiffs' accounts were transferred. In May 1992 Valdes was dismissed from Oppenheimer & Co., Inc. and his license was suspended for fraudulent conduct supposedly unrelated to plaintiffs' accounts. From that time until March 1994, when Valdes' license was renewed, plaintiffs' investments were under the supervision of Valdes's son, Emilio J. Valdes. In 1994 Valdes told plaintiffs about the theft of their funds and has since cooperated with plaintiffs in their investigation.

As noted, the complaint was filed in April 1996. As a result of defendants' activities, plaintiffs say they have been "directly injured in their property by having to pay more for the participation in these investment opportunities ... and are distinctly being injured in their business, that is, the activity of investing in business opportunities." Plaintiffs seek to compel a full accounting of how the funds were used, imposition of a constructive trust, and compensatory and punitive damages.

### II.

Defendants move to dismiss on the grounds that the action: (1) is time-barred, and (2) fails to state a RICO claim against each of the defendants.

On this motion to dismiss, the court assumes the facts stated in the complaint to be true and will grant the motion only if there are no facts under which the plaintiff could prevail. *See Conley v. Gibson* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### III.

■ Defendants say that plaintiffs' claims are time-barred because they had notice of defendants' alleged fraudulent conduct as early as 1984.

■ The court applies a four-year statute of limitations to civil RICO claims. *See Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). Section 1964(c) affords a right to sue for those individuals injured in their "business or property." Thus, a plaintiff's claim accrues, and the statute of limitations begins to run, when a plaintiff discovers, or should have discovered, such injury. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988). The Second Circuit recognizes a "separate accrual" rule whereby a new claim accrues and the four year limitations period begins anew each time a plaintiff discovers, or should have discovered, a "new

and independent injury." *Id.* at 1103; *see Bingham v. Zolt*, 66 F.3d 553, 559 (2d Cir. 1995), *cert. ·denied, Steinberg v. Bingham,* —— U.S. ——, 116 S.Ct. 1418, 134 L.Ed.2d 543 (1996). Thus, a plaintiff may only recover damages for those injuries discoverable in the four years preceding the date suit is brought. *Bingham,* 66 F.3d at 560.

■ An injury is "discoverable" when a plaintiff has "constructive notice of facts sufficient to create a duty to investigate further into the matter." *In re Integrated Resources, Inc. Real Estate Ltd.,* 851 F.Supp. 556, 568 (S.D.N.Y.1994) (quoting *Dodds v. Cigna Securities Inc.,* 12 F.3d 346 (2d Cir. 1993)). In essence, knowledge of the fraud will be imputed to a plaintiff if there are circumstances sufficient to alert a reasonable person to the probability that he or she has been defrauded. *See In re Integrated Resources Real Estate Ltd.,* 815 F.Supp. 620, 638 (S.D.N.Y.1993). A plaintiff need not have full knowledge of the fraud to be put on notice; mere awareness of the general nature of the fraudulent scheme is enough.

Courts in the Southern District of New York have found plaintiffs to be on notice of the probability of fraud where there is clear evidence contradicting representations made to them. *See Lenz v. Associated Inns & Restaurants Co. of America,* 833 F.Supp. 362, 375 (S.D.N.Y.1993) (an asset's decline in value in contradiction to the representations made to plaintiff constitutes inquiry notice as to the probability of fraud); *Butala v. Agashiwala,* 916 F.Supp. 314, 318 (S.D.N.Y.1996) (plaintiffs on inquiry notice where promised return of capital had not occurred, monthly dividend checks had bounced and they had been informed that there were "problems" with the investments); *Henkind v. Brauser,* No. 87 Civ. 4072, 1989 WL 54109 (S.D.N.Y. May 17, 1989) (plaintiffs on notice where they had "gone through two reporting cycles without having received the promised information about the operation of the Partnership").

Here Venezuela and Zaragoza had notice of Curi's and Valdes's misuse of their funds as to the 1982–1984 investment. In 1982 Curi and Valdes promised financial administrators for Venezuela that their $350,000 investment would grow to $550,00 in two years,

a rate well above average market expectations. Two years later, in 1984, Curi and Valdes told the financial administrators that payment of $550,000 would not be in cash as "originally promised" but by the assignment of various mortgages.

Plaintiffs say that Valdes and Curi presented the substitution of mortgages for cash as a legitimate repayment option. But the promise of such a high rate of return combined with the substitution of mortgage assignments for cash put Venezuela and Zaragoza on notice that Curi and Valdes were misusing their funds. A reasonable investor in Venezuela's and Zaragoza's position should have investigated the status of the investment further—either to assess the value of the supposed mortgages, or to demand an accounting of how the funds had been invested. Instead, both Venezuela and Zaragoza continued to transfer funds to the investment accounts.

■ Plaintiffs say that despite the circumstances surrounding the 1982–1984 investment, defendants' fraudulent concealment of the underlying fraud tolls the statute of limitations until plaintiffs' actual discovery of the fraud in 1994 when Valdes confessed. Plaintiffs say that Valdes actively concealed the fraud by submitting fraudulent annual statements containing fictitious transactions.

But the Supreme Court has recently decided that a defendant's fraudulent concealment of the underlying fraud will not toll the limitations period if the plaintiff has failed to exercise due diligence. *Klehr v. A.O. Smith Corporation,* —— U.S. ——, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997). *See also State of New York v. Hendrickson Bros. Inc.,* 840 F.2d 1065 (2d Cir.1988) (defendants' fraudulent concealment tolls limitations period only if plaintiff proves that "continuing ignorance was not attributable" to his or her lack of diligence); *Lenz,* 833 F.Supp. at 373 ("fraudulent concealment does not operate as a trump card on issues of due diligence and constructive knowledge").

Here there is no allegation that plaintiffs exercised diligence in response to the "storm warnings" they received in connection with the 1982–1984 transaction. Thus, because

more than four years have passed, any claims they might have arising from that transaction are now barred.

■ But the limitations period is triggered only if the information plaintiff receives is directly related to the conduct alleged in the complaint and concerns the activities of the particular defendants being sued. *See Morin v. Trupin*, 809 F.Supp. 1081, 1096 (S.D.N.Y.1993); *Butala v. Agashiwala*, No. 95 Civ. 936, 1997 WL 79845 at *5 (S.D.N.Y. 1997).

■ Thus, even if the statute of limitations expired with respect to Venezuela's and Zaragoza's claims against Valdes and Curi for the misuse of funds in connection with the 1982–84 investment, their claims, by virtue of the "separate accrual" rule, are not barred with respect to the other transactions causing "new and independent injury".

Whatever notice Venezuela and Zaragoza received in 1984 also does not begin the running of the statute of limitations with respect to Philippine Islands' claims. Philippine Islands was not a party to the 1982–1984 transaction and thus the court cannot impute any knowledge of defendants' fraudulent conduct to them. In fact, Philippine Islands only first invested their money with Valdes in 1984.

Moreover, the statute of limitations is triggered only as to those defendants about whom the plaintiffs were on notice. There is nothing about the information alleged that plaintiffs' administrators received in 1984 that would make them aware of the alleged participation of Rosa Curi, Jorge Curi, Thomas Janata, Lilliam Janata, Luis Perez Vega, Maria Luisa Perez Vega, Sheldon Feinstein and Eleanor Feinstein.

Accordingly, the court will bar only those claims for damages arising from the 1982–1984 transaction.

### IV.

Defendants say that plaintiffs fail to state a claim under RICO because they: (1) do not plead with particularity the alleged acts of mail and wire fraud; (2) do not allege facts constituting a "pattern of racketeering activi-ty" or a RICO enterprise; and (3) do not allege that each defendant "participated" in the operation or management of the "enterprise."

### V.

The complaint alleges in count I that defendants violated 18 U.S.C. § 1962(c) and in count II that they violated 18 U.S.C. § 1962(d).

■ To establish a violation of section 1962(c), a plaintiff must allege seven elements: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly ... participate[d] in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983). A plaintiff must allege all seven elements against each defendant.

The court addresses defendants' liability under 18 U.S.C. § 1962(d) in Part VII, *infra*.

### A. Racketeering activity

"Racketeering activity" is defined as commission of one of the offenses enumerated in 18 U.S.C. § 1961(1). Mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, are two such offenses.

■ To establish that a defendant violated the mail or wire fraud statutes, plaintiffs must show the existence of scheme or artifice to defraud, defendants' knowing or intentional participation in that scheme, and a mailing or wire transmission in furtherance of such scheme. *See S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir.1996) (citing *United States v. Gelb*, 700 F.2d 875, 879 (2d Cir.1983)). The mailing or wire transmission need not be fraudulent itself or even an essential element of the scheme to defraud in order to be considered in furtherance of the scheme. *See McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir.1992). Rather, it need only be "incident to an essential part of the scheme." *United States v. Altman*, 48 F.3d 96, 102 (2d Cir.1995) (quoting *Pereira v. United States*,

347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954)).

The circumstances constituting the fraud—the time, place, speaker and content of the alleged misrepresentations—must be pled "with particularity." Fed.R.Civ.P. 9(b). *But see Giuliano v. Everything Yogurt, Inc.,* 819 F.Supp. 240, 244 (E.D.N.Y.1993) (complaint need not specify time, place and content where "mechanics" of underlying scheme are sufficiently detailed). While plaintiffs may plead defendant's fraudulent intent generally, they must allege facts that "give rise to a strong inference of fraudulent intent." *S.Q.K.F.C., Inc.,* 84 F.3d at 634. Acts done inadvertently or in good faith do not satisfy the requirements of the mail and wire fraud statutes. *O'Malley v. New York City Transit Authority,* 896 F.2d 704, 706 (2d Cir.1990).

#### B. A "pattern" of racketeering activity

Under 18 U.S.C. § 1961(5), a pattern of racketeering activity requires "at least two acts of racketeering activity" occurring within ten years of each other. 18 U.S.C. § 1961(5). The acts must be related and pose a threat of continued criminal activity. *United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.1989).

A plaintiff can establish that acts are related by proof of temporal proximity, common goals, similarity of methods, or repetition, *id.,* and the element of continuity may be satisfied if plaintiffs allege a series of related predicate acts that are committed over a substantial period of time. *H.J. Inc. v. Northwestern Bell Telephone Co.* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). *But see Indelicato,* 865 F.2d at 1383 (temporal separation of events is a "common feature of a pattern of action," but not an essential one). There must also be some sort of a relationship between the acts and the alleged enterprise. *Indelicato,* 865 F.2d at 1384.

#### C. Participates in

To be liable under 18 U.S.C. § 1962(c), a defendant must have participated "in the operation or management of the enterprise itself." *Reves v. Ernst & Young,*

507 U.S. 170, 185, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993). An enterprise may be operated not only by upper management, but also by individuals who, although only "associated with" the enterprise, nevertheless "exert control over it[.]" *Id.*

#### D. The enterprise

Section 1961(4) of Title 18 defines an "enterprise" to include "any individual, partnership, corporation, association ... and any union or group of individuals associated in fact although not a legal entity[.]" The Supreme Court in *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), held that an "enterprise" is a "group of persons associated together for a common purpose of engaging in a course of conduct" established by "evidence that the various associates function as a continuing unit." *Id.* at 583, 101 S.Ct. at 2528.

Although such association need not have an independent formal structure, it must have an "existence beyond that which is merely to commit each of the acts charged as predicate racketeering offense[.]" *D'Orange v. Feely,* 877 F.Supp. 152, 159 (S.D.N.Y.1995) (internal quotations omitted).

### VI.

In order to prevail on the motion to dismiss, plaintiffs must establish each of the requisite elements of a RICO claim as to each of the defendants.

#### A. Marcelo Curi

The complaint alleges that on approximately seventeen occasions Curi used or caused to be used the interstate mails in violation of 18 U.S.C. § 1341 and on approximately thirteen occasions used the interstate wires in violation of 18 U.S.C. § 1343. These mailings and wire communications facilitated the transactions by which Curi and Valdes purportedly embezzled and stole plaintiffs' money.

Plaintiffs also say that Curi committed several counts of securities fraud in violation of 15 U.S.C. § 78j, and of transporting property stolen or acquired by fraud in violation of 18 U.S.C. § 2314.

### 1. Two predicate acts

■ The following allegations of mail and wire fraud meet the requirements of Fed. R.Civ.P. 9(b).

On November 8, 1976, December 17, 1976 and January 10, 1983, Curi mailed letters to Valdes telling him about investments that had purportedly been made with plaintiffs' money. Plaintiffs say that these investments were either never made, or were not as Curi represented them to be.

On or about January 10, 1983 Curi mailed to Valdes a loan repayment schedule that plaintiffs say was for a loan that either did not exist or that Curi never intended to repay. Plaintiffs say another such schedule was mailed, but they do not specify the date of such mailing.

On May 23, 1991 Curi mailed to Miriam Valdes a check for $20,000 falsely representing that such check was "in satisfaction" of the mortgage secured by plaintiff's money.

On March 26, 1981, December 28, 1984 and March 23, 1985, Miriam mailed, and Curi received, checks from plaintiffs' investment accounts. Plaintiffs say that Curi subsequently "converted" such amounts for his own use.

Curi, while in New Jersey, telephoned Valdes in New York and told him about investments he was making with plaintiffs' money. Plaintiffs say that these telephone conversations occurred on six occasions: February 5, 1978, June 14, 1979, March 9, 1981, May 2, 1982, December 2, 1982 and January 20, 1984.

The remaining allegations of mail and wire fraud are less precise. While plaintiffs say that Curi on about ten occasions mailed or caused to be mailed to Valdes partial payments on the loans or mortgages Curi had purportedly made with plaintiff's money, they either do not list any dates for when these payments were mailed or say that such payments were made over a period of time, for example, between June 14, 1979 and December 18, 1980.

Plaintiffs also say that Curi made other phone calls telling Valdes about alleged investments with plaintiffs' money. But for these calls, plaintiffs only specify the year or month such phone calls occurred. No dates are provided for phone calls Curi made to Valdes improperly asking him to return to Curi certain of plaintiff's funds. Finally, plaintiffs allege that on two occasions Curi made phone calls to facilitate the purchase of property in Colorado and in Florida. Neither the dates of these phone calls nor the substance of what Curi said has been alleged.

Plaintiffs have alleged sufficient facts for the court to infer that a fraudulent scheme existed and that Curi knowingly participated in such scheme to defraud plaintiffs. Funds that were transferred to Curi for investment were never accounted for. Valdes, with whom Curi worked closely, prepared false annual accounting statements that were sent to plaintiffs. Curi made only partial payments on the many loan transactions he entered into using plaintiffs' money. Moreover, plaintiffs allege that various checks have been produced with the markings "aborted transactions" and "CV" indicating money that Curi and Valdes stole directly from plaintiffs.

Plaintiffs have sufficiently alleged that Curi committed at least two acts of racketeering activity. Thus the court need not address the allegations that Curi transported stolen property in violation of 18 U.S.C. § 2314, and committed securities fraud in violation of 15 U.S.C. § 78j.

### 2. Pattern of racketeering activity

■ Plaintiffs have also sufficiently alleged facts from which the court could infer that Curi engaged in a "pattern" of racketeering. Plaintiffs allege at least thirty-four transactions in which Curi and Valdes purportedly diverted plaintiffs' funds. To facilitate these transactions, Curi allegedly committed about thirty-nine predicate acts, at least fourteen of which satisfy the pleading requirements of Fed.R.Civ.P. 9(b). Each act that Curi purportedly committed was related to the overall purpose of stealing and diverting plaintiffs' money. The acts spanned an eighteen-year period between 1976 and 1994. Thus, with respect to Curi, plaintiffs have satisfied the "continuity" plus "relationship"

requirement necessary to establish a "pattern" of racketeering.

### 3. Participate in

■ The complaint adequately alleges that Curi participated in the conduct and management of the enterprise. Although Curi nominally functioned as plaintiffs' counsel, plaintiffs allege that his activities are at the core of the embezzlement scheme. This is not a situation where the attorney merely facilitates a client's fraudulent scheme or assists in its concealment. *See Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.,* 832 F.Supp. 585, 591 (E.D.N.Y.1993). Here, Curi is alleged to have played a central managerial role in the transactions facilitating the fraud.

### 4. The enterprise

■ There are sufficient allegations from which the court can conclude that Curi and Valdes were associated for the purpose of defrauding plaintiffs and that such association, predating the allegations in the complaint, had an existence beyond the commission of the racketeering offenses.

Plaintiffs have alleged a claim under 18 U.S.C. § 1962(c) against Curi.

### B. Rosa Curi and Jorge Curi

■ The allegations do not state facts sufficient to state a RICO claim against Curi's wife Rosa and his son Jorge. The complaint says that Curi, using plaintiffs' money, purchased property in Rosa's and Jorge's names and that Valdes and Curi wrote dozens of checks from plaintiffs' investment accounts payable to them. The complaint also says that the property at 1632 Decatur Street was sold to Cornell Muskan who gave Rosa and Eleanor a purchase money mortgage. Rosa and Eleanor then foreclosed upon the mortgage and reacquired title in the property. None of these allegations constitutes a predicate act. Plaintiffs fail to state a claim under § 1962(c) against Rosa Curi and Jorge Curi.

### C. Luis Perez Vega and Maria Luisa Perez Vega

■ Plaintiffs' claim against the Vega defendants is also defective. The complaint alleges that Curi made loans to his "friend Vega" at 12% interest and that he did not establish payment schedules or fix maturity dates for such loans. The loans were secured by property Vega owned on Kildare Road in Garden City, New York, and in Florida. Vega conveyed the Kildare Road property for "no consideration" to his wife, Maria, and conveyed the deed in the Florida property to Curi and Valdes. The complaint alleges that the transfer of the Kildare Road property was made to avoid Vega's debt to Venezuela.

No acts have been alleged on the part of the Vega defendants which would qualify under 18 U.S.C. § 1961(1) as "predicate acts." Thus, no RICO claim has been alleged against the Vega defendants.

### D. Lilliam Janata and Thomas Janata

■ With respect to Lilliam and Thomas Janata, the complaint alleges that using plaintiffs' money, Curi acquired residential property in Garden City, New York for the benefit of his daughter, Lilliam. The complaint says that Lilliam and her husband, Thomas, committed mail fraud in causing "intermittent" mortgage payments to be mailed to Miriam while at the same time concealing from plaintiffs that the mortgage was in default. The complaint does not specify the dates of these mailings, nor how many payments were actually made. Lilliam and Thomas Janata allegedly stopped making mortgage payments when more than $100,000 was outstanding, and converted such amount for their own uses.

The complaint also says that Curi "fraudulently converted" money from plaintiffs' investment accounts and committed mail fraud to purchase property for Lilliam and Thomas Janata at 105 Garden Street, Garden City, New York and that Curi purchased additional property in their names in Florida and Colorado.

These facts are not sufficient to hold Thomas and Lilliam Janata liable under

RICO. Although plaintiffs allege that defendants committed mail fraud when they mailed intermittent mortgage payments to Miriam, there are no facts alleged demonstrating that they knowingly participated in the fraudulent scheme.

Because Curi has a fiduciary relationship with plaintiffs, his failure to disclose to plaintiffs that the mortgage was in default is part of a scheme to defraud. But Lilliam and Thomas do not have such obligations and therefore the mere failure to disclose, without more, does not constitute a scheme to defraud under the mail fraud statute. *Cf. United States v. Altman,* 48 F.3d 96, 102 (failure to disclose on part of fiduciary is a violation of the mail fraud statute).

Even if Lilliam and Thomas Janata had each committed two acts of mail fraud, the complaint does not allege facts suggesting that Lilliam and Thomas engaged in a "pattern" of racketeering activity. The mailing of partial payments on a mortgage and failure to disclose the fact that such mortgage was in default is, at most, an isolated act of fraud. There is no evidence in the record that such activity would continue.

Finally, nothing in the complaint suggests that Lilliam and Thomas Janata participated in the "operation or management of the enterprise." Even if Thomas and Lilliam Janata were in some instances the intended beneficiaries of Curi's wrongdoing, this is not enough to hold them liable under RICO.

### E. Eleanor Feinstein

■ Plaintiffs do not allege that Eleanor committed an act that would qualify as a predicate act under 18 U.S.C. § 1961(1). The complaint says that Eleanor Feinstein, together with Rosa Curi, was a mortgagee on a purchase money mortgage obtained in connection with the 1632 Decatur Street Property. Eleanor then purportedly foreclosed upon the mortgage, reacquired title, sold the property and converted the proceeds of the sale. These allegations do not constitute a predicate act under RICO, nor are they sufficient for the court to infer that Eleanor acted with fraudulent intent. The complaint plainly fails to state a RICO claim against Eleanor.

### F. Sheldon Feinstein

■ The complaint says that Feinstein committed two acts of mail fraud: on April 26, 1984 when Valdes mailed Feinstein a check for $80,000 made payable to Feinstein "as attorney" and again on June 26, 1985 when Valdes mailed to Feinstein another such check for $5,000. Feinstein improperly deposited these amounts into his escrow account "for his own personal use and the use of Curi." Both of these checks were in connection with the 110th Street conversion project.

The complaint also says that Feinstein committed three acts of securities fraud in violation of 15 U.S.C. § 78j and breached his fiduciary duty to plaintiffs when he entered into a partnership agreement for the purchase of the 72–11 110th Street building, issued cooperative shares in the property to Curi and Valdes under their names or under the name "CV", and then failed to distribute partnership shares to plaintiffs.

These allegations are insufficient to state a RICO claim against Feinstein.

First, securities fraud no longer constitutes a predicate act under RICO. *See* 18 U.S.C. § 1964(c) ("no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of Section 1962"); *ABF Capital Management v. Askin Capital Management, L.P.,* 957 F.Supp. 1308 (S.D.N.Y.1997).

In any event, plaintiffs fail to allege the factual elements necessary to state a claim of securities fraud. To establish a violation under 15 U.S.C. § 78j(b), a plaintiff must allege that defendants made a false representation or omitted to disclose material information "in connection with the purchase or sale of securities." 15 U.S.C. § 78j(b). Plaintiffs must also allege that they suffered injury as a result of their reasonable reliance on such misrepresentation or omission.

■ The test of what constitutes a security is a "flexible one, based primarily upon the substance of the transaction." *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 545

F.Supp. 1314 (S.D.N.Y.1982) (citing *United Housing Foundation Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975)). The court determines if the "scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Fund of Funds,* 545 F.Supp. at 1347 (quoting *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946)).

Whether partnership shares, like those at issue in the 110th Street conversion project, constitute "securities" under § 78j depends on the extent to which the partners exercise a "managerial role in the partnership's affairs[.]" *Mayer v. Oil Field Systems Corp.,* 721 F.2d 59, 65 (2d Cir.1983). The federal securities law does not apply where "general partners have legal rights and responsibilities for the conduct of the partnership's business, which provide access to information, at least latent control, and some protection." *Id.* at 1348 (citations omitted) But it does apply where the partners act more like passive investors with little or no control over the business and whose interest in the venture could better be characterized as an "investment contract." *See, e.g., Henkind v. Brauser,* No. 87 Civ. 4072, 1989 WL 54109 at *5–6 (S.D.N.Y.1989).

While there is insufficient evidence in the record for the court to determine whether the partnership arrangement for the 110th Street property falls within the ambit of the federal securities law, plaintiffs fail to allege that Feinstein made a misleading statement or omitted to disclose a material fact upon which they relied. Feinstein did not have a fiduciary relationship with plaintiffs. Moreover, it is unclear whether he even knew the source of the money he invested on Curi's behalf.

Plaintiffs also have not alleged facts sufficient to establish Feinstein's liability under an "aiding and abetting" theory. Nothing in the complaint says that Feinstein's affirmative acts helped Curi perpetrate the alleged securities fraud or that his inaction violated an independent duty to act. *See ITT, an Intern. Inv. Trust v. Cornfeld,* 619 F.2d 909, 927 (2d Cir.1980).

Second, Feinstein's receipt of plaintiffs' funds, whether or not sufficient to allege violations of the mail fraud statute, does not constitute participation in the "conduct or management of the enterprise itself." *Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525.

To participate in the "conduct" of the enterprise means to be involved in "some degree of [its] direction." *Id.* at 178, 113 S.Ct. at 1169. Mere involvement or association with a RICO enterprise is not enough to establish RICO liability—"the test is not involvement but control." *Dep't of Economic Development v. Arthur Andersen & Co.,* 924 F.Supp. 449, 466 (S.D.N.Y.1996) (quoting *A.I. Credit Corp. v. Hartford Computer Group, Inc.,* 847 F.Supp. 588, 601 (N.D.Ill.1994)).

The enterprise alleged is the association-in-fact of Valdes and Curi for the purpose of defrauding plaintiffs of their money. While Feinstein played a role in the management of the 110th Street partnership, that partnership is not an alleged enterprise in the complaint and involves several individuals unrelated to the allegations here.

At best, the complaint alleges that Feinstein, through the receipt of plaintiffs' funds, knowingly facilitated one of the dozens of transactions by which Curi and Valdes embezzled plaintiffs' money. The knowing receipt of fraudulently obtained funds does not constitute participation in the "operation and management" of the enterprise. *Amalgamated Bank of New York v. Marsh,* 823 F.Supp. 209, 220 (S.D.N.Y.1993). *See also General Motors Corp. v. Ignacio Lopez de Arriortua,* 948 F.Supp. 670, 681 (E.D.Mich. 1996) (knowing receipt of stolen trade secrets does not constitute participation in the RICO enterprise). Having alleged no greater role on Feinstein's part, plaintiffs fail to state a RICO claim against him.

Defendants Sheldon and Eleanor Feinstein move in the alternative for summary judgment on the grounds that they did not commit any predicate acts and had no knowledge of the fraud. Because the court will dismiss the RICO counts against them, it need not address their motion for summary judgment.

## VII.

Plaintiffs also say that each of the defendants conspired to commit two predicate acts of racketeering activity in violation of 18 U.S.C. § 1962(d).

 Section 1962(d) of Title 18 makes it unlawful to "conspire to violate any of the provisions" of § 1962(a), (b), or (c). To plead a violation of § 1962(d), plaintiffs must do more than allege an agreement to commit the predicate acts. Plaintiffs must allege facts from which the court could infer the existence of such agreement and that defendants "understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses." *Morin v. Trupin,* 711 F.Supp. 97, 111 (S.D.N.Y.1989) (citation omitted).

 Here plaintiffs make the conclusory allegation that "Valdes, Miriam and each of the defendants consciously entered into an agreement to commit at least two acts of racketeering in furtherance of the scheme to defraud, steal and embezzle money from the plaintiffs." Later in the complaint it is alleged that defendants "knowingly entered into agreements with each other to engage in the formation and operation of several conspiracies in which defendants committed the predicate acts of racketeering."

Plaintiffs say that the court can infer the existence of an agreement from the fact that each of the defendants personally benefitted from the scheme and from at least one act of racketeering activity.

With respect to Curi, the complaint adequately sets forth facts suggesting that he entered into an agreement with Valdes to commit at least two acts of racketeering activity in furtherance of the scheme to defraud plaintiffs of their money.

 The complaint does not set forth such facts with respect to the remaining defendants. No predicate acts have been alleged as to Rosa, Jorge, Lilliam and Thomas Janata, Luis and Maria Luisa Vega, and Eleanor Feinstein. And while a charge of conspiracy does not require commission of a predicate act, the complaint does not specify what predicate acts these defendants might have agreed to commit. Nor does it allege facts that establish these defendants understood that their actions were part of a pattern of racketeering activity. *See Giuliano v. Everything Yogurt, Inc.,* 819 F.Supp. 240, 249 (E.D.N.Y.1993) (court dismissed conspiracy count where complaint failed "to supply facts to buttress its 'barebones' allegation that defendants conspired to commit mail fraud").

While predicate acts were alleged against Feinstein, there are no facts to suggest that he agreed to participate in the conduct or management of the enterprise. *Neibel v. Trans World Assurance Co.,* 108 F.3d 1123, 1128 (9th Cir.1997) (conspiracy in the RICO context requires an agreement "to operate or manage an enterprise") (quoting *United States v. Antar,* 53 F.3d 568, 581 (3d Cir. 1995)). Conspiring with "someone who is operating or managing the enterprise" is not a basis for liability under 18 U.S.C. § 1962(d). *Id.*

The complaint says that Feinstein knew that the funds Curi transferred to him for investment were fraudulently acquired. But mere knowledge of the scheme, even coupled with personal benefit, is not enough to impose liability for a RICO conspiracy. *Id.*

The RICO conspiracy claims against all defendants except Curi will be dismissed.

## VIII.

Plaintiffs also make state law claims for "fraud and deceit," "fraudulent concealment" and "conversion." Because it appears that these claims are part of the same "case or controversy" as the federal claims, the court retains supplemental jurisdiction over them, even those involving defendants against whom the RICO claims will be dismissed. 28 U.S.C. § 1367(a). But it is unclear whether plaintiffs have alleged the elements of each state law claim with respect to each of the defendants. Accordingly, plaintiffs are directed to replead the state law claims providing the court with a "short and plain statement" of their claims for relief. Fed.R.Civ.P. 8(a).

## IX.

Plaintiffs' claims arising from the 1982–1984 transaction are time-barred.

The court dismisses the RICO claims, counts I and II of the complaint, as to all defendants except Marcelo Curi.

So ordered.